## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL NO. 17-CR-089 (EGS) |
| v. | : | |
| | : | |
| CLARK CALLOWAY, JR., | : | |
| | : | |
| Defendant. | : | |

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

The United States, by and through its attorney, the United States Attorney for the District of Columbia, opposes the defendant's Motion to Dismiss ("Def. Motion"). The defendant's motion is factually inaccurate and based on inapplicable case law. The government further has acted properly, and there is no legal basis for the Court to dismiss, pre-trial, an indictment which charges the defendant with violent criminal conduct.

### Factual Background

On May 5, 2017 the defendant was arrested and charged by Complaint for violations of 18 U.S.C. §§ 922(g) and 924(b). The Affidavit in Support of the Complaint referenced the defendant's public social media posts that expressed his desire to kill others, and statements made by the defendant to a confidential human source (CHS) that he planned on attacking a Metropolitan Police Department station using an AK-47 assault rifle. On May 9, 2017 the defendant was indicted by a Grand Jury that found probable cause to charge him with three firearm related charges: (1) Interstate Transportation of a Firearm and Ammunition in violation of 18 U.S.C. §§ 2 and 924(b); Unlawful Possession of a Firearm and Ammunition (Felon), in violation

1

of 18 U.S.C. §§ 922(g)(1) and (9); and (3) Illegal Possession of a Machine Gun, in violation of 18 U.S.C. §§ 922(o) and 924(a)(2).

The defendant's motion does not offer or demonstrate any facts beyond those in the Complaint or the indictment, and instead relies on incorrect information to claim the government has engaged in inappropriate conduct.   The government identifies the following uncontested facts about the defendant to (1) rebut the defense claims that the defendant was a harmless individual who "would not and could not have committed the charged offenses" Def. Mot. at 5; and (2) demonstrate that the government's investigation was appropriate.

### A.  The Defendant Has a Violent History and Possesses Military Training

The defendant has a long-standing history of committing violent crime and using weapons.[1]   In April 2002, the defendant was arrested for Assault with Intent to Kill While Armed, and later pled guilty to aggravated assault and carrying a dangerous weapon in D.C. Superior Court, after he stabbed another individual.   Complaint ¶ 6.[2]   The defendant was sentenced to one year incarceration for that offense, and was on three years of supervised release following his incarceration.   The defendant subsequently violated his supervised release conditions and was sentenced on two separate occasions to additional terms of incarceration.   In March 2012, the defendant was arrested for attacking and choking his then-wife, and in April 2012, the defendant accepted a deferred sentencing agreement ("DSA"), in D.C. Superior Court, for simple assault.

---

[1] To be clear, the government will not be seeking to introduce the facts of the defendant's prior criminal conduct before the jury.

[2] Most of the factual allegations in this case cited in this Opposition are included in the Affidavit to the Complaint, filed with the Court on May 5, 2017 (ECF Doc. 1).   The government will refer to the Complaint numbered paragraph as Complaint ¶ [Number].

The court then revoked the DSA in August 2012 after the defendant was arrested on charges of contempt for violating a stay away from the victim in that case, and for possessing a prohibited weapon (knife) in 2012DVM01753,[3] and sentenced him on the April 2012 assault.   Since April 2002 to date, the government believes the defendant has been incarcerated or under Court supervision for approximately ten years.

The defendant also is a military veteran, who received infantry and explosives training in the United States Marine Corps from 1997 to 2001.   Complaint ¶ 7.   The defendant boasted about his military experience, including "I know how to make explosives [sic] [t]he Marines taught me this" and "Just as in the United States Marine Corps, I command a small unit of warriors [sic] [j]ust know that they await my orders to strike at the devil, when Babylon least expects it." Complaint ¶¶ 7, 55s.

## B. The Defendant Publicly Supported ISIS and Violent Jihad Prior to Meeting Confidential Human Sources 1, 2 or 3

Long before the defendant communicated with Confidential Human Source 1 ("CHS 1"), Confidential Human Source 2 ("CHS 2"), or Confidential Human Source 3 ("CHS 3") starting in September 2016, the defendant had publicly stated his support for jihad, the designated foreign terrorist group the Islamic State in the Levant ("ISIS") and its violent establishment of an Islamic Caliphate.   Complaint ¶ 14 (May 26 2013 posting).[4]

---

[3] According to that the affidavit for the arrest warrant in that case, the defendant approached his then-wife in violation of his stay away order on May 25, 2012, and stated to her as she tried to walk away from him, "Come here, bitch!   I am going to get you bitch!" while holding a knife in his hand.   The case was dismissed for want of prosecution on October 25, 2012.

[4] See also Complaint ¶¶ 4-5 (Describing ISIS).

In July 2014, the defendant further publicly pledged support to Abu Bakr al-Baghdadi, ISIS' leader, stating "I support the brother Abu al-baghdadi.   I support the ISIS caliphate." Complaint ¶ 15.   On May 3, 2015, he used his Facebook account to voice support for the suspects in the Garland, Texas shooting relating to the "Muhammad Art Exhibit & Contest" event, referring to the two suspects as "martyrs."   Id.   On July 16, 2016, the defendant posted a message urging others to engage in mass violence: "Warriors, don't rely upon European-invented firearms, because firearms, are nothing but machines, that eventually malfunction, and bullets, do run out. My weapons of choice, are the knife, swords, or machetes. The Hutu Rwandan militias, massacred, over 500,000 people, in less than 3 months, in 1994, using machetes alone (of course most of their victims were unarmed women and children who were also Afrikan). When your bullets run out, your going to have to fight these racist, in hand to hand. Think about that." Complaint ¶ 16.

Thus, the defendant's claim that it was CHS1 who first raised jihad with the defendant is false.   Def.'s Mot. at 6 ("the first person Mr. Calloway actually talked to about the subject of jihad and ISIS is CHS1").   Further, when the defendant did speak to CHS1, in communications beginning on September 17, 2016, the defendant stated that he was concerned that CHS1 might be associated with the "feds," Complaint ¶ 22, but nonetheless repeatedly communicated his desire to engage in holy war, Complaint ¶¶ 23-28, claimed support for violent incidents that had occurred, Complaint ¶¶ 23, 28, described his hatred for the United States and the unbelievers (kaffiroon), Complaint ¶¶ 23, 24, 28, claimed he sought to travel to foreign countries to fight, Complaint ¶ 28, and reposted mulitiple pro-ISIS posts that had appeared on CHS1's Facebook page, without prompting from CHS1.   Complaint ¶¶ 29-30.   To be clear, at no point did CHS1

and the defendant meet in person, nor did CHS1 ask the defendant to take any action on CHS1's behalf, or attempt to sell him a weapon.

### C.  The Defendant's Sought to Obtain Firearms from Others

The defendant's fixation with weapons is long-standing: not only has he used knives in furtherance of violent criminal activity, he publicly expressed his desire to acquire both firearms and edged weapons in furtherance of his violent goals.   In the summer of 2016, the defendant began contact with Witness 4 ("W4").[5]   W4 lives in the United States in a jurisdiction outside of Washington, D.C., is not a member of law enforcement, and is not an FBI employee or a confidential human source.   Law enforcement did not speak with W4 until after the defendant's arrest in this case.   When W4 met with law enforcement, it provided information that it had been in communication with the defendant.   W4 reported to law enforcement that in the summer of 2016, the defendant told W4 that a "war was coming," that the defendant claimed to live in a dangerous place in Washington, D.C., and that he wanted a firearm for protection.   The defendant also told W4 that he could not legally obtain a firearm on his own due to his criminal record.   W4 further told law enforcement that in October 2016 – prior to CHS2 ever working with the FBI, and several weeks after the defendant had made contact with CHS1 – that it told the defendant that it was in possession of several firearms, including a pistol.   W4 reported that the defendant then asked W4 to come to Washington, D.C. for Thanksgiving, and to bring and give him one of W4's pistols.   W4 reported to law enforcement that W4 had told the defendant that it would give a pistol to the defendant when W4 traveled to Washington, D.C. to meet the defendant.   W4 told

---

[5] The information in this paragraph was provided to the defendant by discovery letter on August 31, 2017.

law enforcement that it ultimately decided not to travel to Washington, D.C., and that it never met the defendant in person.

Further, CHS2 had a long-standing relationship with the defendant prior to the FBI agreeing to make this person a source in November 2016.   On October 8, 2016, CHS2 texted the defendant a photograph of CHS2 holding an AK-47, and the defendant stated he wanted to buy it from CHS2.   CHS2 refused to sell the firearm to the defendant, and the defendant stated "That is a Kuffar[6] killer!" and that if he, the defendant, had the firearm he would "start a revolutionary war," but all he presently had was a "machete."   Complaint ¶ 31.   As discussed below, the defendant discussed a machete as an alternative means to achieve his violent ends, and in fact possessed one at the time of his arrest.   The defendant simply ignores the existence of W4 and this October 8, 2016 text exchange with CHS2 that clarifies that defendant sought to buy a firearm from CHS2 before CHS2 agreed to assist the government.   Def.'s Mot. at 6-7.

### D.  FBI and Sources' Conduct Were Appropriate

In November 2016, the FBI was introduced to CHS2, and thereafter CHS2 agreed to assist the FBI.   Complaint ¶ 34.   CHS2 informed the FBI that the defendant was interested in obtaining an assault weapon, that CHS2 referred to the defendant as "Brother Jihad" and that the defendant was supportive of ISIS and evidenced a dislike of America and its values.   The FBI confirmed CHS2's statements by reviewing CHS2's phone, which contained the pertinent text messages to and from the defendant.

---

[6] Kuffar is defined as a highly derogatory Arabic term used to refer to non-Muslims.

On December 5, 2016, CHS2, now a source, asked the defendant, through text message, if the defendant still wanted to buy an assault rifle. The defendant shortly thereafter called CHS2 and expressed an interest in purchasing the weapon, but stated he could not afford it at the time. Complaint ¶ 35.   CHS2 did not try to convince the defendant.   The defendant also did not cease contact with CHS2 or tell CHS2 not to talk about weapons or firearms in the future.   Indeed, on February 18, 2017, the defendant, unsolicited, brought up to CHS2 the topic of "toys," which CHS2 took to mean firearms items, and the defendant stated he had not forgotten about the "toys," and to keep the defendant in mind in reference to the sale of the items.   Complaint ¶ 36.

In October 2016, the defendant met CHS3.   CHS3 did not make any comments soliciting substantive conversation until January 2017, when CHS3 commented to the defendant that CHS3 expected to deal with rednecks, to which the defendant responded "InshaALLAH[], we will kill these crackers one day ahki!   I beg ALLAH for the death of these devils."   Complaint ¶ 39. Over the next two months, the defendant continued to make violent and disturbing comments to CHS3.   Complaint ¶¶ 40-42.   On March 10, 2017, CHS3 told the defendant that CHS3 was bringing CHS3's brother two M-16 rifle magazines because CHS3's brother was interested in purchasing a weapon.   The defendant replied he used to shoot the M-16 rifle while at the United States Marine Corps.   Complaint ¶ 43.

On March 31, 2017, CHS3, and the defendant were watching television when an ISIS documentary aired.   During the program, an AK-47 rifle was demonstrated.   The defendant stated to CHS3 that he wanted an AK-47.   After the defendant indicated his interest in the AK-47, CHS3 told the defendant he had access to AK-47s in North Carolina and that CHS3 could obtain such a weapon from persons known to CHS3 for the defendant.   The defendant then

bargained over what specific type of firearm the defendant wanted, and on April 1, 2017, the defendant agreed to purchase a fully automatic AK-47 for $250 from CHS3, with a $100 dollar payment on April 7, 2017, and the balance due on April 14, 2017.   During the bargaining, the defendant continued to express sympathy towards ISIS and its violent tactics.   Complaint ¶¶ 44-48.

### E.   There is No Evidence the Defendant Was Duped Into the Purchase of the Firearm, Rather Record Shows The Defendant Willingly Chose to Possess the Firearm In Order to Assault Others

As the defendant was negotiating with CHS3 for the assault weapon, he was regularly (and independently) posting on his Facebook profile.   On April 1, 2017, the defendant posted multiple messages with violent and disturbing language, as described in the Complaint ¶54a-n, including: "When this race war kicks off, we ain't just slaughtering the Neanderthal.   We are executing coons too.   I call it "coon" hunting with an AK-47."[7]   The defendant also posted: "I have always been popular and loved, yet I just want to kill with impunity."   The defendant also stated "Weapon of choice, Machete, AK-47, hands, penis."   He also posted, "I'm not going to divulge my 'state secrets' Just know that when World War 3 occurs, along with a race war, I will be ready."   He also posted: "I'm surrounded by weakness and evil.   The push back is coming, " and "White devils say that ISIS is placing bombs in laptops.   I say, "war is never pretty, and you ain't seen nothing yet!"   Complaint ¶ 54a.-n.   These messages did not cease on April 1, 2017, and between April 2 and April 9, 2017, the defendant continued to send inflammatory posts.

---

[7] The defendant later clarified after he was arrested by the FBI, that coon in this message referred to African-Americans he considered disloyal, and Neanderthal or cave dweller referred to a white person.

8

Complaint ¶ 54o.-w.   These statements included "Final solution: exterminate the walking devils! Like Hitler"; and "Metro attack in Russia. Wallahi. It is coming!"   On April 7, 2017, the defendant told CHS3 he would provide $60 as an initial down payment for the weapon.   In that conversation CHS3 stated CHS3 would try to get the defendant extra clips and little bit of ammunition.   The defendant told CHS3 that he did not want to use the AK-47 on "unworthy kuffar" but on "crackers."   CHS3 then took the defendant to an ATM and the defendant withdrew money and gave CHS3 $60.   The defendant confirmed that he still owed CHS3 $190, but that he would obtain the money at the time of his acquisition of the firearm.   Complaint ¶ 50.

On April 14, 2017, CHS3 showed the defendant a picture of the AK-47 for sale.   CHS3 asked the defendant what would be the best way to do something since the defendant had been in the military and knew "kuffar tactics."   In response to CHS3's question, the defendant told CHS3 he would do coordinated assaults like the Vietcong did. The defendant later told CHS3, "That's what you do… simultaneously have everybody in like four man units all over the country attack police stations." The defendant also stated "But yeah, just an all-out assault on police stations, any police cruisers, everybody just like … an offensive….like the Tet Offensive, they went full force even if they died. Just bam, bam, bam; Ambush and everything. Ain't no talking with them, just gotta go."   The defendant had previously posted favorable comparisons between the Viet Cong and ISIS.   Complaint ¶ 51 & Note 9.

On April 14, 2017, the defendant continued to make violent and hateful social media posts. For example, he stated that "war was imminent," that "when this war comes, I'm going on a killing/cannibal spree," "AK in route!   Machete on deck!   I'm slaughtering anybody that ain't Muslim in these last days."   Complaint ¶ 55 a.-i.   On April 20, 2017, the defendant continued to

send out inflammatory posts, including "Soon the great killing will commence," and advocating the murder of police officers.   Complaint ¶ 55 l.-r.

On April 22, 2017, the defendant told CHS3 that he expected to pay the remaining $190 on April 28, 2017.   CHS3 confirmed that once CHS3 received full payment, CHS3 would arrange to transport the firearm from another state, and the defendant could expect to receive the firearm on May 4, 2017.   On April 28, 2017, the defendant provided the remaining balance of $190 to CHS3.   The defendant told CHS3 that he was getting the gun to be ready "to do something here." The defendant then stated that he was targeting the First District of the Washington, D.C. Metropolitan Police Department.   Complaint ¶¶ 52-53.

On April 30, 2017, believing that CHS3 would acquire the AK-47 for the defendant, the defendant made several other inflammatory posts, including "I'm ready to slaughter these cave dwellers." He also stated "Ak-47!   Remember this post."   Between April 30, 2017, and May 3, 2017, the defendant posted multiple violent and inflammatory messages, including messages advocating jihad, and the shooting of police officers.   Complaint ¶ s.-ii.

On May 4, 2017, the defendant was invited to CHS3's apartment to take possession of the AK-47 he had purchased.   After receiving the AK-47 from CHS3, the defendant was then arrested.   Recovered inside the defendant's apartment was a machete.

## **Argument**

The defendant acknowledges the government had every reason to investigate the defendant. See Def. Mot. At 2 ("Mr. Calloway's statements in praise of a terrorist organization were troubling") at 4 (It's undisputed that the government had every reason to thoroughly investigate any perceived or potential threats, in particular if they concerned terrorism") and 6

("The government's suspicions of Mr. Calloway arose from postings that he put on his Facebook page. . . . His posts were troubling as he praised the Islamic State which was running rampant in Syria and Iraq. On one occasion Mr. Calloway went as far as lauding the self styled leader of the Islamic State, Abu Bakr al Baghdadi").   In fashioning his motion, the defense ignores the defendant's criminal record of violent offenses; his demonstrated record of noncompliance; his attempts to purchase a firearm from non-FBI sources; the business-like nature of the month long transaction between CHS3 and the defendant; and the defendant's stated intentions during the transaction that reveal his mindset at the time of the transport and receipt of the firearm.   As discussed herein, there is no legal or factual basis to support the defendant's Motion.

### A. Dismissal of an Indictment Or Any Count of the Indictment On Its Face is Not Permitted Under the Federal Rules of Criminal Procedure

Federal Rule of Criminal Procedure ("FRCP") Rule 12(b)(3) lists the permissible motions that must be made before trial, and permits the Court to dismiss an Indictment on its face for a limited number of reasons, including a facial defect in the indictment.[8]   The defense has not alleged any such deficiencies in the indictment.   Instead, they suggest this Court create an exceptional remedy outside of the Federal Rules. Such a claim must fail.

This Circuit has routinely rejected such calls to dismiss criminal charges in an indictment, pre-trial.   Indictments are important and constitutionally mandated devices, which cannot, and

---

[8] In United States v. Verrusio, the Court of Appeals for the District of Columbia expressly recognized that "to be sufficient, an indictment need only inform the defendant of the precise offense of which he is accused so that he may prepare his defense and plead double jeopardy in any further prosecution for the same offense." 762 F.3d 1, 13 (D.C. Cir. 2014) (citing Russell v. United States, 369 U.S. 749, 763–64 (1962) and United States v. Blackley, 167 F.3d 543, 550 (D.C. Cir. 1999)).

should not, be cast aside for reasons beyond those in the Federal Rules. In <u>United States v. Ballestas</u>, 795 F.3d 138, 148 (D.C. Cir. 2015), the Court stressed that dismissal of an indictment is an extreme remedy and rarely should be granted:

> Because a court's "use[ ] [of] its supervisory power to dismiss an indictment . . . directly encroaches upon the fundamental role of the grand jury," dismissal is granted only in unusual circumstances. <u>Whitehouse v. U.S. Dist. Court</u>, 53 F.3d 1349, 1360 (1st Cir.1995) (citing <u>Bank of Nova Scotia v. United States</u>, 487 U.S. 250, 263 [] (1988)). An "indictment's main purpose is 'to inform the defendant of the nature of the accusation against him.'" <u>United States v. Hitt</u>, 249 F.3d 1010, 1016 (D.C. Cir. 2001) (quoting <u>Russell v. United States</u>, 369 U.S. 749, 767 [] (1962)). It therefore need only contain "a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed.R.Crim.P. 7(c).

<u>Id.</u> at 148-49.   <u>See also</u> <u>United States v. McCallister</u>, 2016 WL 3072237, at *6 (D.D.C. May 31, 2016) (recognizing that "the beginning – and end – of the Court's inquiry necessarily must be th[e] indictment" when "defendant has asked the Court to dismiss [a count], pursuant to Federal Rules of Criminal Procedure 12(b)(1) and 12(b)(3)(B)(v)").

The defendant does not challenge any alleged "defect" in the Indictment itself; rather, he challenges the propriety of the government's investigation, and the government's ability to present evidence sufficient to prove Count One at trial.   Neither of these bases may be used to dismiss an Indictment under the FRCP.

### B.  The Outrageous Conduct Doctrine Is Inapplicable in This Case.

Although the government acknowledges that some courts have identified a theoretical outrageous conduct doctrine where undercover operations could theoretically so violate "fundamental fairness, shocking to the universal sense of justice" as to warrant dismissal, <u>see</u> <u>United States v. Russell</u>, 411 U.S. 423, 431-32 (1973) – the application of the doctrine to justify a dismissal is virtually nonexistent, particularly in a pretrial context.

Indeed, the doctrine is almost never applied to dismiss a government case, and the Court of Appeals for the D.C. Circuit has criticized the doctrine, stating that government misconduct must rise to the level of "coercion, violence, or brutality to the person" for a due process violation, and that mere "obnoxious behavior or even flagrant misconduct on the part of the police" will not suffice.  United States v. Kelly, 707 F.2d 1460, 1475-76 (D.C. Cir. 1983) (Separate Opinion in *Per Curiam* decision by Ginsburg, J.).   In United States v. Walls, 70 F.3d 1323, 1329-30 (D.C. Cir. 1995), the court further stated that it doubted that the outrageous conduct defense has much "vitality."   Other courts have acknowledged the same.  See, e.g., United States v. Tucker, 28 F.3d 1420, 1427-28 (6th Cir. 1994)(finding outrageous conduct involving a defendant with predisposition could not amount to a due process violation); United States v. Boyd, 55 F.3d 239, 241 (7th Cir. 1995) (stating the outrageous conduct doctrine  "stillborn," without support, and that it no longer exists); United States v. Santana, 6 F.3d 1 (1st Cir. 1993) ("outrageous conduct" is surpassingly difficult to translate into a closely defined set of behavioral norms; "the doctrine is moribund; in practice, courts have rejected its application with monotonous regularity"); United States v. Jones, 13 F.3d 100, 104 (4th Cir. 1993).   Tellingly, the defense does not (and could not) allege any "coercion, violence, or brutality to" the defendant.   Kelly, 707 F.2d at 1475-76.

### C.  The Government Did Not Engage in Outrageous Conduct.

Even if this Court were to apply the doctrine, there is little guidance on the case law on how to do so.   The case relied on by the defendant, United States v. Black, 733 F.3d 294, 302 (9th Cir. 2013), emphasizes that dismissal of an indictment for outrageous conduct is "limited to extreme cases," and it is necessary to apply an "extremely high standard."   The appellant in that

case did not meet that standard, and the conviction was affirmed. Even if the Court were to apply
Black under the circumstances here (even if done pretrial), it would not change the result.

Black noted six factors that "do not constitute a formalistic checklist, but help focus our
analysis of the totality of circumstances." Black, 733 F.3d at 304.   The factors include 1) the
known criminal characteristics of the defendant; 2) individualized suspicion of the defendant; 3)
the government's role in creating the crime of conviction; 4) the government's encouragement of
the defendant to commit the offense conduct; 5) the nature of the government's participation in
the offense conduct; and 6) the nature of the crime being pursued and necessity for the actions
taken in light of the crime.   While this Circuit has taken a far more skeptical view of this doctrine
than the Ninth Circuit, and that there is very little case law on what would constitute sufficiently
outrageous conduct,[9] even if Black was the appropriate test, these factors all support the
appropriateness of the FBI's actions in apprehending the defendant.

---

[9] Black itself acknowledges that there are only two reported decisions in which federal appellate
courts have reversed convictions under this doctrine.   Black, 733 F.2d at 302.   In United States
v. Twigg, 588 F.2d 373 (3d Cir. 1978), the appellant, who was "lawfully and peacefully minding
his own affairs," was largely set up by the DEA agents in a laboratory to produce contraband,
and assisted the appellant when he had difficulties in committing the crime.   In Greene v.
United States, 454 F.2d 783 (9th Cir. 1971), the government worked with the appellant for two-
and-a-half years in the creation and maintenance of a bootlegging operation, under possible
duress by threat, and for which operation the government was ultimately the only customer. The
defendant's citations do not compel a different result.

In United States v. Gardner, 658 F. Supp. 1573, 1574 (W.D. Pa. 1987), cited by the defendant, a
court found the government's conduct outrageous where an informant repeatedly asked for
narcotics from a defendant who did not do or sell drugs, or have any apparent knowledge of
where the defendant could get any, or provide.   The defendant sometimes acted for free as a go
between for the informant, and the informant, who used some of the drugs, was the only person
to which the defendant provided narcotics.   None of these cases involved a defendant with a
violent criminal record publicly making statements about committing violence, with prior acts of
attempting to procure firearms.

The defendant has a violent criminal history, and was publicly making violent comments in support of a foreign terrorist organization that has committed violence in and against the United States.   The defendant also publicly stated he had the mindset and the ability to carry out acts of violence.   The defendant had even attempted to purchase an assault weapon from CHS2 prior to CHS2 becoming a government source.   In communicating with CHS2, months before bargaining with CHS3, the defendant referenced his possession of a machete, and its use for violence, which also raised legitimate concern for law enforcement.   It also justified the use of CHS3 to interact with the defendant.

While the defense claims that the FBI should have simply ignored the defendant, it would have been the height of folly for law enforcement to simply ignore a person convicted of a violent felony, posting violent, inflammatory messages, and associating himself with ISIS, and who had recently sought to acquire firearms.   In sum, the first three <u>Black</u> factors, "relevant to the way in which the government set up the sting," <u>Black</u> 733 F.3d at 303-304, demonstrate the government's singular focus on a legitimate concern that the defendant would acquire weapons to act out his views in conformance with prior statements and behavior.   There is nothing wrong, or offensive to constitutional due process, with the government offering to sell a weapon to a defendant who is engaged in violent rants, and who had previously tried to purchase a similar weapon a few months before.

There is also no evidence that the lengthy arm's length transaction between the defendant and CHS3 was coercive, controlling, or otherwise untoward.   In an "outrageousness" analysis, it is significant that there was no coercive relationship between the defendant and any of the CHSs in this case.   <u>See</u> <u>Black</u> 733 F.3d at 308.   Further, although the government provided the firearm

that was ultimately purchased, any concerns that the government had long term involvement in the scheme, or took offensive conduct during the scheme, is simply non-existent.   See id.   The defendant was fully capable of seeking out a firearm, and, as it turns out, had already solicited firearms from W4 and CHS2 – schemes that could well have later come to fruition but for the government's involvement.

The last factor in Black, the need for the investigative technique, is readily apparent here. It was not required that law enforcement simply wait to see if the defendant would purchase a loaded firearm, possibly in a nonsurveilled setting, and see if he would use that firearm to do exactly what he said he was going to do on public Facebook postings.   Similar to the risk management assessment of Black's reverse sting, law enforcement's decision to have an undercover source interact with the defendant in a setting where the interactions were taped or saved on electronic devices was far preferable to the potential lethal consequences of an uncontrolled purchase.

In the time leading up to May 4, 2017, when the defendant acquired the AK-47 in his hands, his actions and rhetoric increased and he repeatedly stated his desire to murder many individuals, especially unbelievers, white people, and police officers, by machine gun (and also by machete).   Prior to any proposed sale of a weapon by a government source, the defendant showed a predisposition to acquire firearms from W4 and CHS2, and commit acts of violence. Although the government sold the AK-47 to the defendant, the bargaining and ultimate sale of the AK-47 were more akin to a straight business transaction than an effort to persuade the defendant to do anything.   Even when the defendant lacked the proper funds to purchase the firearm, CHS3

16

was restrained in that CHS3 did not offer discounts, or otherwise encourage the final purchase, leaving it to the defendant to make the choice himself.

### D.  The Defendant Had the Necessary Intent to Violate 18 U.S.C. § 924(b)

As noted above, the defendant's arguments in attacking a valid indictment are an improper attempt to decide a question that is solely for the grand jury and petite jury to determine. See United States v. Mosquera-Murillo, 153 F.Supp.3d 130, 154 (D.D.C. 2015) (Howell, J.) (indicating that when considering a motion to dismiss an indictment, a court assumes the truth of the government's factual allegations (citing Ballestas, 795 F.3d at 149); United States v. Sunia, 643 F.Supp.2d 51, 60 (D.D.C. 2009) (Walton, J.) (court "must presume the allegations of the indictment to be true and may not dismiss an indictment on a determination of facts that should have been developed at trial" (citations omitted)).   Nevertheless, the defendant asserts that the Court should dismiss Court One, the Interstate Transportation of a Firearm count, for lack of proof of the defendant's intent.

As discussed above, after the defendant had twice attempted to illegally acquire firearms from CHS2 and W4, he decided to purchase one from CHS3, who appeared able to procure one. After the defendant told CHS3 that he supported ISIS, and agreed to purchase the AK-47 from CHS3, the defendant posted on his social media that he was about to acquire a firearm and that he was planning use it violently against people in the community he deemed unworthy.   The defendant also paid for the weapon over time—which demonstrated his long-standing desire to acquire the weapon was not a one-time flirtation.   Before acquiring the weapon, but after making an initial payment for the weapon, the defendant told CHS3 that he was going to use an AK-47 to commit acts of violence and to kill police officers in the District of Columbia.

17

To prove a violation of 18 U.S.C. §924(b) the government must demonstrate that the defendant (1) willfully transports, ships, or causes to transport a firearm; (2) the weapon crossed jurisdictional lines; and (3) the defendant had the intent to commit a felony offense.   See, e.g., 18 U.S.C. §924(b); United States v. Krug, 20 Fed Appx. 271, 276-78 (6th Cir. 2001).   The indictment alleges that the defendant intended to violate 22 D.C. Code § 402 (Assault with a Deadly or Dangerous Weapon (ADW)) when he sought and ultimately obtained the AK-47 weapon.   The elements of ADW are:

1) The defendant, with force or violence attempted or tried to injury another person;

2) He did so voluntarily, on purpose, and not by mistake or accident;

3) At the time the defendant had the apparent ability to injure a person; and

4) The defendant committed the act with a dangerous weapon.

D.C. Criminal Jury Instructions ("Red Book") Instr. 4.101 A (Attempted Battery Assault).   Of course, the defendant is not charged with Assault with a Deadly Weapon, only with having the intent to commit this crime as the firearm was transported and acquired in violation of 18 U.S.C. §924(b ).   Also, count one of the Indictment also charges the defendant with a violation of 18 U.S.C. §2, Causing an Act to be Done: thus the defendant's guilt can be based upon the intent he had when he caused CHS3 to obtain and transport the firearm to him.

The government submits that from the moment the defendant paid CHS3 for the AK-47, which caused CHS3 to begin to arrange for the movement of the AK-47 across state lines, until the defendant received the firearm and was arrested, the defendant had this intention.   The evidence to be adduced at trial will include (but not be limited to) conduct alleged in the Complaint, namely that the defendant made numerous public statements about his intent to kill

18

and harm others as he was seeking the AK-47, and that he made statements to CHS3 that he intended to kill Metropolitan Police Department officers with the weapon.   Complaint ¶¶ 52-53. It will also include the defendant's statements to law enforcement and others.   Because the trial evidence will show that the defendant had illicit intent when he caused the firearm and ammunition to be shipped, caused it to be transported, and ultimately received in the District of Columbia, a conviction under 18 U.S.C. §924(b) would be appropriate.   See Krug, 20 Fed. Appx. at 278.

The defendant cites no case law to support his claim that in order to prove intent to commit a crime, one must actually commit the crime itself.   The defendant only cites United States v. Trevino 720 F.2d 395, 400 (5th Cir. 1983), in which the government charged the defendant with a violation of 18 U.S.C. §924(b) with the intent to violate a federal felony statute, 18 U.S.C. §2113, after the appellant committed a successful, violent robbery.   While the indictment alleged an intended violation of 18 U.S.C. §2113, at trial the government did not prove that the robbery was in fact of a federal financial institution as defined by statute.   The court concluded that the defendant need not be aware of the bank's status, and that the defendant in fact intended to rob that institution, regardless of whether it fell within § 2113(f)'s definition of "bank," but the institution did need to meet the federal definition.   The Court also acknowledged, however, that the conviction would have been valid if the government had charged the defendant with violating the Texas state bank robbery statute to effectuate a violation of 18 U.S.C. §924(b), but that because the indictment only charged an intent to violate federal law, the bank's status was essential for conviction.   In the instant case, no jurisdictional element exists, and the defendant has been charged with acquiring the firearm with illicit intent to violate D.C. Code § 402.

In the same vein, the defendant's argument that the defendant lacked criminal intent under 18 U.S.C. §924(b) because he did not immediately use the weapon to threaten someone misses the point.   The defendant's intent in obtaining (or causing to transport) the firearm is what controls: to suggest otherwise would read new language into the statute and absurdly limit the factfinder from using circumstantial evidence to find a defendant's intent.   This element does not exist in 18 U.S.C. §924(b), and a jury can properly consider the defendant's intent in shipping, transporting, receiving, (or procuring) a firearm, or causing it to be so shipped, transported or procured, based on circumstantial evidence.   <u>See</u> <u>Red Book Jury Instr.</u> 3.101 (Proof of State of Mind) ("someone's intent ordinarily cannot be proved directly, because there is no way of knowing what a person is actually thinking, but you may infer intent from the surrounding circumstances.   You may consider any statement made or acts done [or omitted] by [the defendant] and all other facts and circumstances received in evidence which indicate his/her intent").   The Court should therefore conclude this claim lacks any factual or legal merit.

## <u>Conclusion</u>

For the reasons stated above, the government requests that the Court deny the defendant's motion.

Respectfully submitted,

Jessie K. Liu
United States Attorney

By:      _____/s/_____
         Jeff Pearlman
         D.C. Bar No. 466-901
         Tejpal S. Chawla
         D.C. Bar. No. 464-012
         Assistant United States Attorneys
         555 4th Street, N.W.
         Washington, D.C. 20530
         202-252-7228 (Pearlman)
         202-252-7280 (Chawla)
         Jeffrey.pearlman@usdoj.gov
         Tejpal.Chawla@usdoj.gov