**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CRIMINAL NO. 17-CR-089 (EGS)** |
| **v.** | : | |
| | : | |
| **CLARK CALLOWAY, JR.,** | : | **Sentencing Date:     January 20, 2019** |
| | : | |
| **Defendant.** | : | |

### GOVERNMENT'S SENTENCING MEMORANDUM AND
### MOTION TO DEPART UPWARD FROM GUIDELINE RANGE

After arranging to receive a fully-automatic AK-47 with 90 rounds of ammunition from a

government confidential human source ("CHS3"), the defendant made innumerable public taunts

and threats on Facebook, including the following:

From April 14, 2017

"150 push-ups! 50 pull-ups! Ak in route! Machete on deck! I'm slaughtering
anybody that ain't Muslim in these last days."

From April 20, 2017

o  I got the FBI watching me. O.k. Since 2015. ALLAH sees everything though. I
only fear ALLAH. I fear no white, decalcified devils.
o  Soon, the suicide bombers will appear.

From April 30, 2017, just four days before he was arrested:

o  Just as in the United States Marine Corps, I command a small unit of warriors. I
won't give out a number. Just know that they await my orders to strike at the devil,
when Babylon least expects it.
o  Never underestimate a Marine corps veteran.
o  I'm ready to slaughter these cave dwellers.
o  AK-47! Remember this post.

\*\*\*

1

On May 4, 2017, the defendant, a convicted felon who had publicly avowed support of ISIS and its leader Abdul Al-Baghdadi,[1] finally held in his hands the fully automatic AK-47 machine gun he had ordered from across state lines. Obtaining this killing machine was the culmination of months of effort: the defendant had made two prior (unsuccessful) attempts to obtain a firearm, and he had finally saved enough money to buy the AK-47 from CHS3. As the defendant explained to CHS3, he was purchasing the AK-47 now because he was ready to act, that is, the defendant believed that he finally had the instrument to convert his violent threats and ideology into action. Specifically, the defendant believed that he could use the AK-47 that he arranged to acquire in interstate transport against those he hated, which included: law enforcement, including military veterans (who he describes a "pigs"), persons in the West (which he describes as "Babylon"), non-Muslims (who he describes as *kuffar*, and "pork-eaters"), and white people (whom he referred to as "cave dwellers," "crackers," "Neanderthals," "devils," "de-calcified" and "non-melaninated"). The government submits that the defendant posted "AK-47! Remember this post" because he wanted to make it clear to his Facebook followers (and to any future investigators) that they would know, in case of his death, why he did his future crimes.

Thankfully, the defendant was thwarted by the Federal Bureau of Investigation ("FBI"), and the defendant was arrested on May 4, 2017. Following a failed effort to dismiss the Indictment,

---

[1] On October 15, 2004, the United States Secretary of State designated al-Qaeda in Iraq (AQI), then known as Jam'at al Tawhid wa'al-Jihad, as a Foreign Terrorist Organization ("FTO") under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity ("SDGT") under section 1(b) of Executive Order 13224. On or about May 15, 2014, the Secretary of State amended the designation to add the alias Islamic State of Iraq and the Levant ("ISIL"), The Islamic State of Iraq and al-Sham, the Islamic State of Iraq and Syria, ad-Dawla al-Islamiyya fi al-Iraq wa-sh-Sham, Daesh, and Dawla al Islamiya, and Al-Firquan Establishment for Media Production (collectively referred to herein as "ISIS").

the defendant acknowledged the overwhelming evidence against him and on October 18, 2018, pled guilty to all three counts in the indictment: (1) Interstate Transportation of a Firearm and Ammunition in violation of 18 U.S.C. §§ 2 and 924(b) and 22 D.C. Code §401; Unlawful Possession of a Firearm and Ammunition (Felon), in violation of 18 U.S.C. §§ 922(g)(1) and (9); and (3) Illegal Possession of a Machine Gun, in violation of 18 U.S.C. §§ 922(o) and 924(a)(2). The government made no promises to the defendant as part of the plea, and the defendant pled guilty understanding that the United States was likely going to seek an upward departure or variance from the voluntary U.S. Sentencing Guidelines ("U.S.S.G.").[2] While the defendant has pled guilty to his crimes, unfortunately, his fixation on hatred and violence has not changed since he has been incarcerated.

As discussed herein, an upward departure from the U.S.S.G. is warranted in this case for several reasons, a number of which have been identified as departure principles in U.S.S.G. §§ 5K2.0(a) (Grounds for (Upward) Departure), 5K2.6 (Weapons and Dangerous Instrumentalities); 5K2.9 (Criminal Purpose); and 5K2.14 (Public Welfare). An above Guidelines sentence is also appropriate as a variance, in light of the factors set forth in 18 U.S.C. §3553(a). Taking all aggravating (and mitigating) circumstances and factors into account, a significant period of incarceration is warranted in this case, not only to punish the defendant for his offenses – which included an effort to commit mass murder in the name of extremist ideology and rage – but to protect the community while properly deterring him, and others, from similar conduct. In sum the

---

[2] In its plea offer to the defendant, the government specifically advised the defendant that the government would be free to seek an upward departure under Chapter 5K of the U.S.S.G. Defense counsel advised the government that this language was one of the reasons the defendant rejected the plea offer.

government believes that a five (5) level enhancement is appropriate, which increases the defendant's sentencing guideline range to level 28 (Criminal History Category III), which has a guideline range of 97 to 121 months. Each of the defendant's three convictions carries a maximum period of incarceration of 120 months (maximum punishment of 360 months), and the government asks that the Court sentence the defendant to a minimum sentence of 120 months incarceration, followed by three years of intensive supervised release, with programing to assist the defendant to de-radicalize his current, violent ideology.

**Factual Summary**

**A.  The Defendant Is An ISIS Supporter Who Fosters Hate and Wished to Kill Non-Muslims, Whites, and Law Enforcement (Including Veterans)**

The defendant in the last several years established multiple Facebook accounts, some of which Facebook shut down for violations of terms and use of service. On May 26, 2013, the defendant stated his support for jihad, the designated foreign terrorist group ISIS and its violent establishment of an Islamic Caliphate. Complaint ¶ 14 (May 26, 2013 posting).[3]  In July 2014, the defendant further publicly pledged support to Abu Bakr al-Baghdadi, ISIS' leader, stating, "I support the brother Abu al-baghdadi. I support the ISIS caliphate." Complaint ¶ 15. This support post-dated the United States' designation of ISIS as a Foreign Terrorist Organization ("FTO"). While the origin of the defendant's radicalization is not completely known to the government, the defendant has stated on Facebook that while he was in prison he met Al-Qa'ida members. Id. The United States has confirmed through the U.S. Bureau of Prisons that when the defendant was incarcerated in Philadelphia in 2009, he was housed with Muhamad Shnewer, one of the

---

[3] See also Complaint ¶¶ 4-5 (Describing ISIS); 29-30 (posting pro-Mujahedeen/ISIS posts)

defendants convicted of perpetrating a planned terrorist attack on Fort Dix, New Jersey in 2007-collectively known as the Fort Dix 6 – who were inspired by Osama Bin Laden and Al-Qa'ida. The defendant further discussed traveling to ISIS territory to fight, see id. at ¶ 24 (telling CHS1 of his interest in fighting in Yemen), and ¶ 46 (defendant telling CHS3 he wanted to travel to ISIS but did not have enough money), before deciding that he did not need to travel abroad to kill kuffar because the "kuffar is here." Id. at ¶ 48.

The defendant has regularly communicated via Facebook his support for ISIS ideology and those who have committed violent terrorist acts. See id. at ¶¶ 15 (including stating the perpetrators of the Garland, Texas shooting relating to the "Muhammad Art Exhibit & Contest" event were "martyrs"), and 16-19. These threats progressively worsened, and by late 2016, the defendant's rhetoric and threats had escalated significantly and he began to espouse his own desires to commit violent crime in the name of his ideology, and the need to do so immediately. See id. at 16-19, 55 and 56. He shared this desire to punish the West and the United States with at least three other people, CHS1, CHS2, and CHS3, during this same period, see id. at ¶ ¶ 20-53,[4]

---

[4] On September 20, 2016, in communicating with Confidential Human Source 1 ("CHS1") about a terrorist attack that took place in New Jersey and New York, the defendant stated "Good. MaashALLAH! This entire place is insane! May ALLAH destroy it, as it destroyed Sodom, and Gomorrah!" Complaint ¶ 23. On September 25, 2016, the defendant stated that he preferred "Jihad" to "Dawah" (sharing the word of Allah as expressed in the Qur'an) and that "I hate al kaffiroon [disbelievers] anyway." Id. at ¶ 24. He also acknowledged he was a "soldier of Allah" and that he had made Facebook "friends" with several individuals he believed were ISIS members. Id. at ¶ 25. That same day, the defendant stated that he knew of an individual that was arrested, charged, and convicted of a plot to kill U.S. military personnel at Fort Dix Military Base in New Jersey, stating, "This government must be overthrown. Wallahi [I swear by God]. I'm going to kill some of these crackers before the death angel approaches. I have a vendetta against them . . . InshaALLAH [God willing(hopefully)]. The battlefield will be here shortly. InshaALLAH." Id. at ¶¶ 27-28. He also told CHS3 on March 6, 2017, "I hate these Kuffar [non-Muslims]. Not only

and the statements coincided with the defendant's efforts to obtain firearms from multiple sources. See id. at ¶ 31 (attempting to acquire assault weapon from witness who later became CHS2, and describing the weapon as a "Kuffar Killer"); and Gov. Opp to Def. Mot. To Dismiss (Docket 29) at 5-6 (defendant attempting to acquire firearms from a non-governmental source, Witness 4 ("W4"), in October 2016). These actions all predated the defendant's successful acquisition of the firearm from CHS3 in May 2017, by which time the defendant himself stated he was ready to commit violence with the weapon. Id. at ¶ 46-55.

The defendant's desire to commit violence was not limited to non-Muslims. He also regularly advocated for the killing of white people. Id. at ¶ 17 (advocating a race war against whites and stating, "Let's put bullets in them"); ¶ 28 (having a "vendetta" and wanting to "kill some of these crackers"); ¶ 39 (wanting to "kill these crackers one day"); and ¶ 50 (wanting to use AK-47 against "crackers" instead of "kuffar"). He also regularly advocated for violence and death against law enforcement. Id. at ¶ 19 ("two pigs were just shot in Boise, Idaho," apparently referencing a shooting of law enforcement officers in Idaho, and stating "choose the bullet over the ballot"); ¶ 54 c. ("When this race war kicks off, we ain't just slaughtering the Neanderthal. We are executing coons too. I call it "coon" hunting with an AK-47!")[5]; ¶ 55 i ("military and combat veterans: Prepare for death"); ¶ 55 dd. (placing bounty on police officers who killed black man);

---

are they nasty, they are filthy and stupid. InshaALLAH, their time is coming. Cracker Trump just issued another Ban on 7 Muslim countries. InshaALLAH, the end is near!" Id. at ¶ 41.

[5] The defendant stated after he was arrested by the FBI, that "coon" in this message referred to African-Americans he considered disloyal, and "Neanderthal" or "cave dweller" referred to a white person.

and ¶ 55 hh. and ii ("Somebody should shoot that cracker cop that killed that young boy in Texas. . . . Its time we start killing them," and "Brothers are shooting these cops back. Good.").

### B. The Defendant Obtained Weapons and Repeatedly Tried to Obtain Firearms Before Purchasing the AK-47 From CHS3

As the defendant's ideological fixation progressed, by October 2016 he developed a violent criminal intent that included obtaining weapons and firearms. Witness 2, who would later become Confidential Human Source 2 ("W2/CHS2"),[6] was a person known to the defendant since the summer of 2015 – they were fellow Muslims who had similar jobs –and W2/CHS2 called the defendant "Brother Jihad" because of the defendant's ideological extremism. On October 8, 2016 – before W2/CHS2 had even been contacted by the FBI – W2/CHS2 sent to the defendant's phone a picture of CHS2 holding an AK-47 by text message. In response, the defendant messaged that he wanted to buy that weapon from W2/CHS2. Complaint ¶ 31. W2/CHS2 refused, to which the defendant stated via text message, "I wouldn't sell it either. That is a Kuffar killer!" Id. The defendant stated that he thought the firearm was an SKS (a brand of assault rifle) but W2/CHS2 assured the defendant the firearm was an AK-47. The defendant responded by text, "I was close. 7.62 mm bullets. That will split someone in half. A chopper!" Id. W2/CHS2 responded again, "Hunter point bullets," and the defendant responded "Right, or hallow tip! **If I had that I would start a revolutionary war!**" Id. (Emphasis added). The defendant then stated "All I have is a machete."

This conversation is telling for several reasons. First, the defendant expressed in October 2016 a clear intent, that if he had the AK-47 weapon that he would start a war against the kuffar

---

[6] Witness 2 was contacted by the FBI in November 2016, and became CHS2 shortly thereafter.

(i.e. "kuffar killer"). This is the same motive the defendant told CHS3 several months later when he purchased, and later acquired, the fully automatic AK-47. Second, the defendant's effort to acquire the firearm from W2/CHS2 was itself unlawful (both because W2/CHS2 was a felon, as was the defendant), and shows that the defendant was seeking to obtain the firearm from a person he believed to be a trusted source who would not go to the FBI. Third, the defendant admitted he possessed the machete as a weapon against the kuffar, and a machete was recovered from the defendant's home when he was arrested. The defendant stated multiple times that he would use a machete in an attack. See id. at ¶ ¶ 16 ("My weapons of choice are the knife, sword, or machetes") 54 e ("my weapons of choice are Machete, AK-47, hands, and penis"); and 55 f ("150 push-ups! 50 pull-ups! Ak in route! Machete on deck! I'm slaughtering anybody that ain't Muslim in these last days"). As the Court is aware, ISIS actively called for edged weapon terrorist attacks in October 2016, and an edged weapon was used in the Ohio State terrorist attack in November 2016. See Robin Wright, "The Hand of ISIS at Ohio State," November 29, 2016," available at https://www.newyorker.com/news/news-desk/the-hand-of-isis-at-ohio-state (describing ISIS' public call for attacks against the West using edged weapons in September and October 2016).

Separately, the defendant further sought to obtain firearms from another friend ("W4") in November 2016. W4 spoke to law enforcement after the defendant was arrested and acknowledged communicating with the defendant through the internet and phone. W4 stated to law enforcement that the defendant told W4 in October and November 2016 that "war is coming." The defendant advised W4 he lived in a dangerous place and wanted a weapon for protection, and that he stated he was not allowed to possess a firearm because he had a criminal record. W4 stated that in October 2016, the defendant invited W4 to Washington, D.C. for Thanksgiving and that he

asked W4 to bring him a pistol, which the defendant instructed W4 to place in W4's bag. W4 indicated that it ultimately did not travel to visit the defendant and it did not transport any firearm to or for the defendant.

### C. The Defendant Purchased the AK-47 with the Intent to Kill Those He Hates

In late October 2016, the defendant met CHS3.[7] CHS3 did not solicit substantive conversation until January 2017, when CHS3 commented to the defendant that CHS3 expected to deal with rednecks, to which the defendant responded "InshaALLAH[], we will kill these crackers [white people] one day ahki! I beg ALLAH for the death of these devils." Complaint ¶ 39. Over the next two months, the defendant talked about ISIS with CHS3 and the defendant continued to make disturbing and violent comments. Complaint ¶¶ 40-42.

On March 31, 2017, CHS3, and the defendant were watching television when an ISIS documentary aired. During the program, an ISIS fighter shooting an AK-47 rifle was shown. The

---

[7] The defendant pled guilty to the Indictment and without a plea bargain with the Government. As a result, there was also no agreed upon statement of facts. At the colloquy, the Court stated that there needed to be an adequate factual predicate for the Court to determine if there was a factual basis for the plea. The government then read extensively from the 30 page Affidavit in Support of the Complaint (ECF Doc. 1), particularly the defendant's inculpatory statements to CHS3. See 10/18/18 Tr. at 6-8 (referencing Complaint ¶¶ 38-39, 41-47, 48, 50-53, 56). At the end, the defendant was asked if what was said was true, and the defendant responded: "Um, for the most part. I honestly don't remember ever saying I was going to a police station and doing anything with a weapon . . . But for the most part the paraphrasing is correct." Id. at 8. Later in the colloquy, the defendant stated he wanted to plead guilty because "at the end of the day, for the most part, everything that's said as far as the evidence provided is true." Id. at 10. The defendant appeared to object to the suggestion that he planned an attack on a specific police station, but otherwise appears to have accepted the statements made by the Government. The defendant acknowledged in his written statement to the Court that on April 7, 2017, at the time that the defendant made an initial payment on the AK-47, he told CHS3 "that he wanted to use the AK-47 on 'crackers.'" (ECF. Doc. No. 32).

defendant stated to CHS3 that he wanted an AK-47. After the defendant indicated his interest in the AK-47, CHS3 told the defendant he had access to AK-47s in North Carolina and that CHS3 could obtain such a weapon from persons known to CHS3 for the defendant. As CHS3 and the defendant continued to watch the ISIS documentary, a scene showed five or six men, on the ground, wearing orange jumpsuits, waiting to be beheaded by ISIS fighters. After the beheading, CHS3 yelled, "Allah Akbar." The defendant stated, "I'm glad you caught that because the Kuffar would not catch that," which CHS3 interpreted as the defendant's agreement with the beheadings, and a dislike of the documentary journalist's feelings toward the beheadings. That evening, the defendant acknowledged he had thought about traveling to fight for ISIS, but could not afford the cost of travel. Later that evening the defendant and CHS3 bargained over what specific type of firearm the defendant wanted. On April 1, 2017, the defendant agreed to purchase a fully automatic AK-47 for $250 from CHS3, with a $100 dollar down payment on April 7, 2017, and the balance to be due on April 14, 2017. During the bargaining for the weapon, the defendant continued to express support of ISIS and its violent tactics. Complaint ¶¶ 44-48.

As the defendant was negotiating with CHS3 for the assault weapon, he was regularly posting on his Facebook profile. On April 1, 2017, the defendant posted multiple messages with violent and disturbing language, as described in the Complaint ¶ 54a-n, including:

- When this race war kicks off, we ain't just slaughtering the Neanderthal. We are executing coons too. I call it "coon" hunting with an AK-47."
- I have always been popular and loved, yet I just want to kill with impunity.
- Weapon of choice, Machete, AK-47, hands, penis.
- I'm not going to divulge my 'state secrets' Just know that when World War 3 occurs, along with a race war, I will be ready." He also posted: "I'm surrounded by weakness and evil. The push back is coming,
- "White devils say that ISIS is placing bombs in laptops. I say, "war is never pretty, and you ain't seen nothing yet!"

Between April 2 and April 9, 2017, the defendant continued to publish inflammatory posts. Id. at ¶ 54o.-w. These statements included "Final solution: exterminate the walking devils! Like Hitler"; "Bless the mujaideen." On April 7, 2017, the defendant told CHS3 he would provide $60 as an initial down payment for the weapon. In that conversation CHS3 stated CHS3 would try to get the defendant extra clips and a little bit of ammunition. The defendant told CHS3 that he did not want to use the AK-47 on "unworthy kuffar" but on "crackers" (white people). CHS3 then took the defendant to an ATM and the defendant withdrew money and gave CHS3 $60. The defendant confirmed that he still owed CHS3 $190, but that he would obtain the money at the time of his acquisition of the firearm. Id. at ¶ 50.

On April 14, 2017, CHS3 sent the defendant a picture of the AK-47 he was selling to the defendant. CHS3 asked the defendant what would be the best way to do something since the defendant had been in the military and knew "kuffar tactics." In response to CHS3's question, the defendant told CHS3 he would do coordinated assaults like the Vietcong did. The defendant later told CHS3, "That's what you do… simultaneously have everybody in like four man units all over the country attack police stations." The defendant also stated "But yeah, just an all-out assault on police stations, any police cruisers, everybody just like … an offensive….like the Tet Offensive, they went full force even if they died. Just bam, bam, bam; Ambush and everything. Ain't no talking with them, just gotta go." The defendant had previously posted favorable comparisons between the Viet Cong and ISIS. Id. at ¶ 51 and fn. 9.

On April 14, 2017, the defendant continued to make violent and threatening social media posts. For example, he stated, "war was imminent," that "when this war comes, I'm going on a

killing/cannibal spree," "AK in route! Machete on deck! I'm slaughtering anybody that ain't Muslim in these last days." Complaint ¶ 55 a.-i. On April 20, 2017, the defendant continued to send out inflammatory posts, including "Soon the great killing will commence," and advocating for the murder of police officers. Complaint ¶ 55 l.-r.

On April 22, 2017, the defendant told CHS3 that he expected to pay the remaining $190 on April 28, 2017. CHS3 confirmed that once CHS3 received full payment, CHS3 would arrange to transport the firearm from another state, and the defendant could expect to receive the firearm on May 4, 2017. On April 28, 2017, the defendant provided the remaining balance of $190 to CHS3. The defendant told CHS3 that he was getting the gun to be ready. The defendant stated "They come down we gonna have to do something here. Like we talk about." The defendant clarified, "we gotta go to the police," but that "I don't want no brothers man but if they don't get out of the fucking way . . ."   The defendant, in response to CHS3 stating "Kuffar" further stated "they most likely Kuffar but you have some Muslims who are police . . . Not too many but they are there. Most of them are First District, I'm telling you." The defendant then described the location of the First District of the Washington, D.C. Metropolitan Police Department. Taken together with the numerous other Facebook posts directed towards killing police, the evidence firmly proves that the defendant intended to kill police officers, particularly white officers, with the fully automatic AK-47 that he was acquiring. While the question of why the defendant wished to kill multiple police officers is mixed (i.e. he hates the police, he hates non-Muslims, wants to overthrow the existing order and he supports ISIS), his intent to kill, harm, and ambush them others is no less frightening or dangerous.

On April 30, 2017, believing that CHS3 would be soon delivering the AK-47 to the defendant, the defendant made more inflammatory Facebook posts, including "I'm ready to slaughter these cave dwellers." He also stated "Ak-47! Remember this post." Between April 30, 2017, and May 3, 2017, the defendant again posted multiple violent and threatening messages, including messages advocating jihad, and the shooting of police officers. Complaint ¶ 55 s.-ii. On May 3, 2017, the day before he was to receive the firearm, the defendant posted "Somebody should shoot that cracker cop that killed the young Black boy in Texas. These crackers kill a Melanininated man every week. It's time we start killing them." Complaint ¶55 hh. The defendant also posted "Death to the European, fake, Jewish imposters," "Amerikkka must be defeated," and "While the pork eaters sleep. I hunt. sub-human prey, for consumption." Complaint ¶¶ 55 aa, bb, ee.

On May 4, 2017, the defendant was invited to CHS3's apartment to take possession of the AK-47 he had purchased. After receiving the AK-47 from CHS3, the defendant was then arrested. Recovered inside the defendant's apartment was a machete. The defendant waived his Miranda rights and acknowledged that he had discussions with others about attacking police stations but he denied referencing a specific station.

### D. The Defendant Has Retained His Violent and Extremist Views Despite Pleading Guilty

Since being the detained at the D.C. Jail on May 4, 2017, the defendant has evidenced the same violent ideology and views that were the cause of this case. Specifically, the United States has obtained information from a person who was detained with the defendant. This witness ("W7") is not a government agent, and is someone who met and spoke with the defendant while they were

incarcerated. According to W7, the defendant told it that the defendant believed he was set up by a Muslim friend and the defendant stated he was "going to get his ass" when the defendant left prison. The government believes the defendant was referencing CHS3.

W7 also observed the defendant while they were watching television. W7 indicated that the defendant, after watching a news story of alleged police brutality, stated that that behavior was why he wanted to "fuck one of them up." W7 stated it recalled the defendant making similar statements about law enforcement officers (that he would like to harm them) on more than 10 occasions. In particular, W7 recalled an incident in May 2018, when local media publicized the killing of a female Baltimore County police officer during a traffic stop. The defendant stated to W7 that he approved of the killing because although the officer was woman, she was also a police officer.

The defendant further stated to W7 that he did not intend to target the First Police District in Washington, D.C., but that he wanted to attack any police officers he could, so long as they were white. W7 reported that the defendant stated he could not stand white police officers, and that he would attack them by ambushing them. The defendant further told W7 that he knew how to ambush people from his prior military training. W7 also stated that it recalled the defendant state that he hated white people and that he wanted to kill white men. W7 observed the defendant yelling at D.C. Jail to white people, "you should be dead," on multiple occasions. W7 further stated that the defendant commented to it about ISIS and stated, "ISIS is doing the right thing and "ISIS is smart."

### Determining the Sentence

"[A] district court should begin all sentencing proceedings by correctly calculating the

applicable Guidelines range[,]" which is "the starting point and the initial benchmark" for the sentence to be imposed. Gall, 552 U.S. at 49. "Then, 'after giving both parties an opportunity to argue for whatever sentence they deem appropriate,' the court considers all of the section 3553(a) sentencing factors and undertakes 'an individual assessment based on the facts presented.'" United States v. Akhigbe, 642 F.3d 1078, 1084 (D.C. Cir. 2011) (quoting Gall, 552 U.S. at 49-50). The government submits that the above-calculated Guidelines range, including the upward departures, is consonant with the applicable factors set forth in 18 U.S.C. § 3553(a). In any event, a sentence of 120 months is supported by the § 3553(a) factors as a variance.

Under § 3553(a), "[t]he Court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). The purposes of sentencing are as follows:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

The Section 3553(a) factors include the following: (1) "the nature and circumstances of the offense," 18 U.S.C. § 3553(a)(1); (2) "the history and characteristics of the defendant," id.; (3) the promotion of "respect for the law," 18 U.S.C. § 3553(a)(2)(A); (4) "deterrence," 18 U.S.C. § 3553 (a)(2)(B); (5) the Guidelines and Guideline range, § 3553(a)(4); and (6) "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," § 3553(a)(6).

Of course, a "sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply," Rita v. United States, 551 U.S. 338, 351 (2007), and it "may not presume that the Guidelines range is reasonable," Gall, 552 U.S. at 50; Nelson v. United States, 555 U.S. 350, 350 (2009). Examination of the Section 3553(a) factors, however, shows that a Guidelines sentence, including the requested upward departure, is appropriate in this case.

A.     **United States Sentencing Guidelines Calculation**

In fashioning an appropriate sentence in the aftermath of United States v. Booker, 543 U.S. 220 (2005), the Court must undertake a multi-step process beginning with a correct calculation of the applicable Guidelines range, based on findings of fact.

> As a matter of administration and to secure nationwide consistency, the Sentencing Guidelines should be the starting point and the initial benchmark. The Guidelines are not the only consideration, however. Accordingly, after giving both parties an opportunity to argue for whatever sentence they deem appropriate, the [court] should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [the court] may not presume that the Guidelines range is reasonable . . . [but] must make an individualized assessment based on the facts presented. If [the court] decides that an outside-Guidelines sentence is warranted, [the court] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance. . . . After settling on the appropriate sentence, [the court] must adequately explain the chosen sentence to allow for meaningful appellate review [under an abuse-of-discretion standard] and to promote the perception of fair sentencing.

Gall v. United States, 552 U.S. 38, 49-50 (2007) (citations omitted).

The government submits that the PSR did not account for an additional Guideline adjustment, and additionally contends that the applicable Guideline is inadequate in this particular case. The government has reviewed the Presentence Investigation Report (PSR), which calculates a Guidelines base offense level of 22 for Unlawful Possession of a Machine Gun, 18 U.S.C. § 922(o), under § 2K2.1, and grouped the remaining counts pursuant to § 3D1.2(a). With

16

a Category III Criminal History (with which the government agrees), and a three point subtraction for acceptance of responsibility (level 19), the PSR calculates the Guidelines range as 37-46 months. The government has objected to the PSR for two reasons. First, the PSR does not take into account that the defendant "possessed or transferred [the AK-47 and ammunition) with knowledge, intent, or reason to believe that it would be used or possessed in connection with another felony offense," 2K2.1(b)(6)(B), which would warrant a four point increase in the offense level to 23, with an Guidelines range of 57-71 months. Second, it does not include warranted upward departures under Section 5K of the U.S.S.G.

The enhancement under U.S.S.G. §2K2.1(b)(6)(B) is clearly applicable based on the undisputed facts of this case. At the time that the defendant possessed the AK-47 and ammunition, the defendant had provided extensive evidence of his intent through his prior online public posts and his statements to CHS1, CHS2, CHS3 and W4. As discussed above, the defendant sought an assault rifle from CHS2 specifically because he "would start a revolutionary war" based on his radical religious viewpoint and his hatred of white people and law enforcement. Specifically, the defendant sought the weapon to commit mass murder, and he told CHS3 that he wanted the weapon as they watched an ISIS documentary and as the defendant actively displayed his support of ISIS and its terror tactics, including beheadings. After making arrangements to acquire the AK-47, the defendant's references to the weapon were in the context of murdering people he hated. The defendant also did not shy away from discussing how he would use the weapon: he repeatedly claimed a desire to ambush his victims, to imitate to tactics of the Viet Cong, and to target police and police stations. The defendant's Facebook posts also referenced his view that the AK-47 would be used close in time to his receipt of the weapon, stating, "war was imminent," that these

were the "last days," and that the killing would commence "soon."   In his posts, the defendant emphasized that the "Ak [was] in route!" and he was ready to begin "slaughtering."   In sum, the defendant possessed the weapon ready, willing, and now able to commit a felony, that is to shoot and kill police officers and non-muslims. The Court may further find that this requisite intent existed either at the time that the defendant caused the firearm to be transferred across state lines, or when the defendant took possession of the AK-47, or both, and apply the four point increase. Here, the defendant was also charged with 18 U.S.C. § 924(b)(2) for aiding, abetting, counseling, commanding, inducing, or procuring the transfer of the AK-47 across state lines. See Indictment, Count One (Charging Causing an Act to Be Done). The defendant is therefore not just liable for having the intent to commit a felony for possessing the firearm, but is guilty for arranging for a transfer through his payment for the AK-47 for CHS3 to carry the AK-47 across state lines.

Application note 14 to U.S.S.G. §2K2.1 confirms this enhancement should apply where "the firearm or ammunition . . . had the potential of facilitating another felony offense or another offense, respectively." No additional act by the defendant once he facilitated transfer or took possession (or in this case, both) is legally or practically necessary – the defendant admitted as much when he acknowledged his guilt at the plea hearing and stated that he sought to use the AK-47 against "crackers," without any further action beyond taking possession of the gun. See United States v. Dodge, 61 F.3d 142 (2d Cir. 1995) (upholding application of 2K2.1(b)(5) (which contained similar language to 2K2.1(b)(6)) where undercover officer provided a firearm and other contraband after statements of intent and provision of money; defendant was arrested "shortly thereafter").

18

To the extent that the PSR writer spoke with a representative of the U.S.S.C. about the enhancement, their opinion appears to have been dictated by a conclusion that, "the defendant did not take any substantial steps toward committing 'another felony offense,'" but this is not only contrary to the text of guideline, it is factually inaccurate. See Final PSR at p. 28. The defendant prepared for his crime by negotiating the purchase a fully automatic weapon, including an extended clip of ammunition, he then made a downpayment for that weapon, he documented his deadly intent in several public Facebook posts ("AK-47! Remember this post!"), and he then paid money and accepted delivery of the weapon and ammunition. The posts similarly constitute what can be considered suicide or death notes, which the defendant left behind for police and loved ones to explain his impending crimes. At bottom, there is more than sufficient evidence to conclude, based on the preponderance of the evidence, that the defendant had formed the requisite intent to commit another felony (at a minimum, assault with a dangerous weapon). See USSG § 6A1.3 comment (stating use of a preponderance of the evidence standard is appropriate to meet due process requirements and policy concerns in resolving disputes regarding application of the guidelines to the facts of a case).

### B.    Departure From the Guideline Range Is Appropriate.

The government submits that a calculated level 26, criminal history category III, is inadequate to address this defendant's conduct, and that an individualized assessment of the facts in this case compels a significant upward departure or, in the alternative, a variance under applicable § 3553(a) factors.

In Koon v. United States, the Supreme Court set forth a four-part test for appropriateness of both upward and downward departures:

> 1)    What features of this case, potentially, take it outside the Guidelines' 'heartland' and make of it a special, or unusual, case?
> 2)    Has the Commission forbidden departures based on those features?
> 3)    If not, has the Commission encouraged departures based on those features?
> 4)    If not, has the Commission discouraged departures based on those features?

518 U.S. 81, 95 (1996).

The features of this case that take it "outside the heartland" of U.S.S.G. § 2K2.1 are: (1) the defendant's professed allegiance to terrorist groups and ideology; (2) his intent to inflict mass murder; (3) his desire to cause fear in the populace in an effort to cause a revolution; (4) his intent to commit violence based upon his hatred of the victims' race (white), religion (non-Muslim), and occupation (law enforcement); (5) his repeated and determined efforts to obtain a firearm; and (6) his continued adherence to the same intolerant ideology since being incarcerated.

U.S.S.G. §5K2.0(a)(1) recognizes that a sentencing court may depart upward where the basis for departure is an "aggravated circumstance of a kind, or a degree not adequately taken into consideration by the Sentencing Commission . . . ." These aggravated circumstances include instances identified expressly in U.S.S.G. §5K, or where they are otherwise unidentified, but nonetheless aggravating circumstance. These six factors identified above are not accounted for in the applicable Guideline provision (U.S.S.G. §2K2.1), but they are identified departure principles identified in the U.S.S.G. §§, 5K2.6 (Weapons and Dangerous Instrumentalities); 5K2.9 (Criminal Purpose); and 5K2.14 (Public Welfare). The government believes that a five level increase (one level for 5K2.6, and two levels each for 5K2.9 and 5K2.14) above the government's calculated level 26 is appropriate given the unique aggravating circumstances present in this case.

### 1.  **Calloway's Dangerous Weapons Are An Aggravating Factor**

Pursuant to U.S.S.G. § 5K.2.6 a departure may be warranted based upon the defendant's possession of a dangerous weapon. Factors to consider are "the dangerousness of the weapon, the manner in which it was used and the extent to which its use endangered others." Here the defendant's weapons, a convicted felon with a history of violent crime, were a machete, and a fully automatic AK-47 assault rifle with approximately 90 rounds of ammunition. The defendant also has military training and bragged about being able to ambush victims. The defendant's goal was to kill many people, and while U.S.S.G. §2K2.1 takes into account either the defendant's possession of a rifle or a semi-automatic weapon capable of accepting a large capacity magazine, it does not provide for any enhancement for having fully automatic weapon, or a fully automatic weapon with a large capacity magazine, being used against the police. See U.S.S.G. §2K2.1(a)(ii) and application note 11(D) (upward departure applicable where the offense "carried substantial risk of death or bodily injury to multiple individuals"). Courts have regularly applied this departure even where the weapon was not used. See, e.g., United States v. Serrano, 392 Fed. Appx. 358 (5th Cir. 2010) (automatic weapons stored in a family home with children sufficient for departure); United States v. Hardy, 99 F.3d 1242 (1st Cir. 1996) (affirming departure based on multiple guns, despite no injury to victims, and rejecting claim that weapon type cannot be considered in approving the departure). The defendant's conduct in this case- possessing a machine gun with a large capacity magazine (as well as a machete) with the intent to commit mass murder of law enforcement officers by ambush, demonstrates possession of the weapon carried with it a substantial risk of death, and one that qualifies for an enhancement under U.S.S.G.

§5K2.6. The government seeks an upward departure of one additional level under this aggravating

factor.

## 2.     Calloway's True Criminal Purpose is An Aggravating Factor

Pursuant to U.S.S.G. § 5K.2.9 a departure may be warranted where the defendant

"committed the offense to facilitate . . . the commission of another offense." Here the defendant

was intending to commit (or at least attempt to) murder multiple law enforcement victims in the

District of Columbia. While the defendant should face a four level increase under 2K2.1(b)(6)(B)

for the reasons discussed above, the four level increase does not sufficiently take into account the

serious risk and danger posed by the defendant. Not all felonies are equal, but U.S.S.G.

§2K2.1(b)(6)(B) treats a grand larceny television felony the same as attempted murder of multiple

people. This is where U.S.S.G. §5K2.9 fills the void. By way of comparison, U.S.S.G. §2K2.1

contemplates applying a harsher sentencing guideline provision where the firearm was actually

used in another crime or in an "attempt, solicitation, or conspiracy" to commit the other crime,

see U.S.S.G. cross reference to §2K2.1(c)(1)(A), but it does not take into account cases where the

other crime was thwarted just before the defendant crossed the line into an attempted felony

offense.[8] The U.S.S.G. §5K2.9 departure principle is broader, and allows the Court to upwardly

depart based up on the defendant's true criminal purpose, which was more than to just possess a

weapon, or engage in a single act of violence. The defendant was intent on committing mass

murder based on a twisted ideology that sought to destroy our society. That he failed does not

---

[8] If a defendant possessed a prohibited weapon to commit a murder, and then took a substantial step toward committing a murder, see D.C. Jury Instructions (Redbook) §7.101, United States v. Duran, 884 F.Supp. 566 (D.D.C. 1995), the applicable guideline would be, pursuant to U.S.S.G. §2K2.1(c)((1), U.S.S.G. §2A2.1(a)(1).

change the defendant's evil and nefarious purpose, and does not reduce this crime to an act of simple gun possession. If the cross-reference provision of U.S.S.G. §2K2.1(c)(1) applied, that being Attempted Murder in the First Degree, the defendant would be facing a base level 33. See U.S.S.G. §2A2.1(a)(1). Under the circumstances, the government's request of a two-level departure under this departure principle is appropriate.

3.     **Calloway's Threat to the Public Safety is An Aggravating Factor**

U.S.S.G. § 5K2.14 permits the court to depart upward to reflect the "nature and circumstances of the offense" if "national security, public health, or safety was significantly endangered." U.S.S.G. § 2K2.1 simply does not account for the defendant's intent to commit an ideologically driven, mass casualty event in the Nation's Capital.

Courts interpreting U.S.S.G. 5K2.14 have long acknowledged that a defendant's threat to public or national security is appropriate, even in cases where no harm directly results from the defendant's actions. See, e.g., United States v. Nelson, 296 Fed. Appx. 475 (6th Circ. 2008) (affirming departure in gun case where felon sold weapons that caused significant public risk); United States v. Vargas, 73 Fed. Appx. 746 (5th Cir. 2003) (affirming departure in part based on risk to national security caused by person who sold false social security cards to individuals who hail from nations who are known to support terrorism, even where no evidence that these cards were actually used by terrorists, because "the guidelines encourage departures for offense conduct which specifically endangers national security"); United States v. Semsak, 336 F.3d 1123 (9th Cir. 2003) (applying enhancement in an involuntary manslaughter, drunk driving case based on defendant's pre-accident conduct that involved in his risk to public safety in speeding, and running other cars off the road, but which were not injured or damaged). This case presents such a situation

for several reasons.

First, the defendant was trying to kill law enforcement officers. The repugnancy of this crime and the public safety risk at issue in such a crime is obvious – further, it carries substantial risks of injury, harm, and death to everyone in the zone of danger created by the defendant. Second, the defendant's crime and intent was harm to society and intimidate specific communities based upon his ideology, which mixes equal part hatred, racial animosity and religious grievance. The evidence strongly demonstrates that the defendant, in his Facebook posts and comments to CHS2 and CHS3, wanted kill non-Muslims to further his religious views, cause a violent revolution against Western government and the U.S. social order, and intimidate the police officers and white people in our community. Third, the defendant sought to commit this heinous crime with a *fully automatic AK-47 assault weapon with an extended ammunition clip*. The defendant selected the AK-47 after watching it being used by ISIS fighters on television, and he did not possess it to go rob a bank, or commit a burglary; rather, the purpose of the AK-47 was kill many people in a short period of time to create a memorable event against those he hated. The breadth of this risk is why, in part, the Guidelines permit for an enhancement under U.S.S.G. §5K2.17 (Semiautomatic Firearms Capable of Accepting Large Capacity Magazine), in part based on "the degree to which the nature of the weapon increased the likelihood of death or injury in the circumstances of the particular case." Had the defendant, undetected, purchased this same weapon to commit assaults against multiple individuals based on their perceived association with a particular group hated by the defendant, the defendant would likely have committed a mass casualty event. The defendant's risk to public safety and the national security justifies an

additional two level departure, for a total departure of five levels, to level 28, with the same criminal history score (III) which is a range of 97 to 121 months.

### B.     Application of the Section 3553(a) Factors

#### 1.     Nature and Circumstances of the Offense

Section 3553(a)(2)(A) requires the court, in determining the particular sentence to be imposed on Calloway, to consider the need for the sentence to "reflect the seriousness of the offense." As set forth above, the defendant possessed an incredibly dangerous weapon and sought to commit an even greater crime that was thwarted by the FBI. The defendant sought the AK-47 weapon to kill a number of different people (non-Muslims, "crackers," perceived traitorous African Americans, and law enforcement), and to do so in a spectacular way to advance a twisted ideological view that was tied to a terrorist group. It is frankly hard to imagine a worse purpose for a machine gun than using it to engage in an active-shooting to create a mass casualty event on an unsuspecting group, but that is exactly what the defendant sought to do.

#### 2.     History and Characteristics of the Defendant

Next, Section 3553(a)(1) requires the court, in determining the particular sentence to be imposed, to consider "the history and characteristics of the defendant."

The defendant has a long-standing history of committing violent crime and using weapons. In April 2002, the defendant was arrested for Assault with Intent to Kill While Armed, and later pled guilty to aggravated assault and carrying a dangerous weapon in D.C. Superior Court, after he stabbed another individual. Complaint ¶ 6. The defendant was sentenced to one-year incarceration for that offense, and was on three years of supervised release following his incarceration. The defendant repeatedly violated his supervised release conditions and was

sentenced on two separate occasions to additional terms of incarceration. In March 2012, the defendant was arrested for attacking and choking his then-wife, and in April 2012, the defendant accepted a deferred sentencing agreement ("DSA"), in D.C. Superior Court, for simple assault. The DSA included a stay away provision. The court then revoked the DSA in August 2012 after the defendant was also arrested on charges of contempt for violating the stay away from the victim, and for possessing a prohibited weapon (knife) in 2012DVM01753,[9] and sentenced him on the April 2012 assault. Since April 2002 to date, the government believes the defendant has been incarcerated or under Court supervision for approximately ten years for these two matters.

The defendant also is a military veteran, who received infantry and explosives training in the United States Marine Corps from 1997 to 2001. Complaint ¶ 7. The defendant boasted about his military experience, including "I know how to make explosives [sic] [t]he Marines taught me this" and "Just as in the United States Marine Corps, I command a small unit of warriors [sic] [j]ust know that they await my orders to strike at the devil, when Babylon least expects it." Id. at ¶¶ 7, 55s. During the defendant's time in the military, the defendant was disciplined for assaulting another Marine, which may have related to having disobeyed an order to not fire blank rounds within 10 feet of another Marine. The defendant was adjudicated; his pay was docked, and was placed on restricted duty.

In sum, the defendant's prior history shows violent behavior and the use of weapons, and a litany of examples showing contempt for the legal system. These factors demonstrate that the

---

[9] According to that the affidavit for the arrest warrant in that case, the defendant approached his then-wife in violation of his stay away order on May 25, 2012, and stated to her as she tried to walk away from him, "Come here, bitch! I am going to get you bitch!" while holding a knife in his hand. The case was dismissed for want of prosecution on October 25, 2012.

defendant cannot be trusted to be nonviolent, or otherwise abide by terms of supervised release. The defendant's history therefore supports the imposition of a significant period of incarceration.

### 3.   Respect for the Law and Deterrence.

Section 3553(a)(2)(A) & (B) requires the Court, in determining the sentence to be imposed on the defendant, to consider the need for the sentence to promote "respect for the law" and to "afford adequate deterrence to criminal conduct." The defendant himself requires specific deterrence to keep him committing additional criminal activity. More to the point, the defendant is a risk to kill members of this community unless he is incarcerated. Also, and unfortunately, the defendant is not the only individual who would seek to perpetrate a mass casualty event using a machinegun. It is important to deter other individuals who would find themselves on that dangerous path, and have an understanding that even the mere transfer and possession of a firearm with the requisite intent may be enough to warrant serious punishment, even if the mass casualty event does not come to its lethal fruition.

### 4.   Consideration of the Applicable The Guidelines Range (and Departures)

The government acknowledges that the advisory Guidelines range should be given considerable weight. As discussed above, the government believes that an upward departure from the applicable Guideline Range is appropriate, resulting in a Guideline range of 97 to 121 months, and that the defendant should be sentenced to the high end of that range (not exceed the statutory maximum of 120 months per count).

### 5.    Avoiding Unwarranted Sentencing Disparities

Section 3553(a)(6) requires the Court, in determining the particular sentence to be imposed on the defendant, to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."

The facts of this case are similar to that of United States v. Wehelie, 1:16-CR-162 (E.D. Va. July 14, 2017). The FBI's investigation of Wehelie started with evidence showing that he aspired to travel overseas to join ISIS. See Gov. Sentencing Memo at 1 (attached as Exhibt 1). To further the investigation, an undercover FBI employee ("UCE-1") was introduced to Wehelie in December 2015. Id. Over the course of a few meetings with UCE-1, Wehelie, a convicted felon, expressed a willingness to help UCE-1 move firearms across state lines. Id. at 1-2. On February 18, 2016, Wehelie did just that by transporting four 9 mm automatic pistols with can-style suppressors and eight 20 round magazines from Maryland into Virginia. Id. at 2.Defendant Wehelie and UCE-1 watched an ISIS video together, and Wehelie expressed a desire to travel overseas to join ISIS in Libya. Id. During a March 30, 2016 meeting, UCE-1 asked Wehelie what he would do if he could not travel overseas. Id. The defendant described how he would go about attacking a United States Armed Forces Recruiting Station. Id. at 2-3. According to Wehelie, he wanted to cause a lot of damage and "empty the clip." Id. at 3. Wehelie further identified a Marine Corps Recruiting Station as an ideal target. Id.

Following the defendant's guilty plea to one count of possessing firearms as a convicted felon in violation of 18 U.S.C. § 922(g)(1), the Court sentenced Wehelie to a statutory maximum sentence of 120 months. See id. (ECF No. 54 at 2). In doing so, the Court imposed an upward variant sentence given Wehelie's uncharged terrorism-related intentions, and notwithstanding the

fact that the Court calculated the total offense level as 19 and a Criminal History Category of II, resulting in an advisory Guidelines range of 33 to 41 months. To paraphrase Judge Lee's remarks during the sentencing hearing, the Court "should have grave concerns about a young man even talking about such a thing [committing a terrorist attack]," and we "should take [the defendant] at [his] word."[10] The <u>Wehelie</u> case demonstrates that an upward departure to of 120 months in this case is reasonable and appropriate, and avoids unwarranted sentencing disparities.

### Conclusion

For the reasons stated above, the government requests that this Court grant the govenrment's motion to depart upward and impose a custodial term of 120 months incarceration as an appropriate sentence in this case.

Respectfully submitted,

Jessie K. Liu
United States Attorney

By:               /s/
               Jeff Pearlman
               D.C. Bar No. 466-901
               Tejpal S. Chawla
               D.C. Bar. No. 464-012
               Assistant United States Attorneys
               555 4th Street, N.W.
               Washington, D.C. 20530
               202-252-7228 (Pearlman)
               202-252-7280 (Chawla)
               Jeffrey.pearlman@usdoj.gov
               Tejpal.Chawla@usdoj.gov

---

[10]  Rachel Weiner, "He talked about committing a terrorist attack. He'll go to prison for 10 years," <u>Washington Post</u>, July 14, 2017, located at https://www.washingtonpost.com/local/publicsafety/ he-talked-about-committing-a-terrorist-attack-hell-go-to-prison-for-10-years/2017/07/14 dc312e82-67dc-11e7-9928-22d00a47778f_story.html?utm_term=.5a6eca75dca9.