**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) ) ) ) ) ) ) ) ) ) | Criminal No.: 17-89 (EGS) |
| **CLARK CALLOWAY** | | |

## SENTENCING MEMORANDUM

On October 18, 2018, Mr. Calloway entered a guilty plea to the three count indictment charging him with Interstate Transportation of a Firearm and Ammunition in violation of 18 U.S.C. § 924(b), and 18 U.S.C. § Sec. 2 Causing and Act to be done, Unlawful Possession of a Firearm and Ammunition in violation of 18 U.S.C. §§ 922(g)(1) & (9), and Unlawful Possession of a Machine Gun in violation of 18 U.S.C. Sec. 922(o) & 924(a)(2). The charged offenses all took place on May 5, 2017.

Pursuant to the convictions Mr. Calloway faces a maximum sentence of ten years of incarceration, a fine of up to $250,000.00 and a maximum term of supervised release of three years on each count. Probation Officer Crystal Lustig in the Pre-Sentence Investigation Report (the "PSR") calculated a sentencing guideline range of 37 to 46 months of incarceration pursuant to the advisory United States Sentencing Guidelines. The range is based on a final Base Offense Level 19 and a Criminal History Category III PSR ¶ 104. Mr. Calloway will appear before the Court on February 15, 2019 for his Sentencing Hearing.

Pursuant to the United States Sentencing Guidelines, 18 U.S.C. 3553(a), Mr. Calloway respectfully requests the court to impose a prison sentence of 37 months.

1

A.  **PURSUANT TO 18 U.S.C. § 3553(a) A PRISON SENTENCE OF THIRTY-SEVEN MONTHS FOLLOWED BY THREE YEARS OF SUPERVISED RELEASE WOULD CONSTITUTE A REASONABLE AND APPROPRIATE SENTENCE**.

In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court rendered the federal sentencing guidelines advisory. In Booker, the Court further held that judges are required to "take account of the Guidelines together with other sentencing factors," and to "consider" the guidelines along with all the other required factors. Id. at 224. (Emphasis added). The properly calculated Sentencing Guidelines are the starting point and initial benchmark in all sentencing proceedings Gall v. United States, 552 U.S. 38, 49-50 (2007). In Gall the Supreme Court held that after giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the enumerated factors of 18 U.S.C. §3553(a) to determine whether they support the sentence requested by a party. In so doing, the court may not presume that the Guidelines range is reasonable. The Court must make an "individualized assessment based on the facts presented." Id.

18 U.S.C. § 3553(a) allows the Court to take into account the particularized factors of the entirety of Mr. Calloway's life and not just his criminal conduct. This approach is consistent with 28 U.S.C. § 991(b)(1)(B) which provides sentencing courts with discretion to "maint[ain] sufficient flexibility to permit individualized sentences when warranted by mitigating or aggravating factors not taken into account in the establishment of general sentencing practices." Application of 18 U.S.C. § 3553(a) and 28 U.S.C. § 991(b)(1)(B) provide support for the imposition of a prison sentence of thirty-seven months.

The circumstances of this case along with Mr. Calloway's history, exemplifies why the Supreme Court restored a sentencing courts' discretion "to consider every convicted person as an

Individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." Pepper v. United States, 131 S.Ct. 1229, 1239-40 (2011) (internal quotations and citations omitted). The factors addressed below, both individually and in combination, suggest and support why the guideline sentence of thirty-seven months of incarceration is a punishment that is "sufficient, but not greater than necessary, to accomplish the sentencing goals advanced." Kimbrough v. United States, 552 U.S. 85, 111(2007)

**The Nature and Circumstances of the Offense and the Characteristics Of the Defendant**

**a. The Nature and Circumstances of the Offense**

Mr. Calloway's offense conduct consists of receiving the firearm that the FBI carried in interstate commerce which was provided to a confidential informant who then gave it to Mr. Calloway. Mr. Calloway possessed the firearm a mere thirty seconds before the same FBI team in full SWAT gear entered the apartment to arrest him. Beyond receiving the firearm, there is no evidence of any concrete plan to utilize the firearm in any way or to advance any of the statements he made on social media or to the confidential informants. Notwithstanding the government's "full court" press in which they utilized three confidential informants, scoured his social media history, social media contacts, and any other form of investigation they could not and cannot point to any evidence of planning to do the things he said publicly or privately to the confidential informants. The result of the extensive investigation revealed that Mr. Calloway did not have a single association with an ISIS leader, recruiter, follower or sympathizer. In fact he never met a single self-proclaimed ISIS supporter, soldier or warrior.

The government left no stone unturned in their effort to ferret out something criminally tangible in Mr. Calloway's life. However, to their chagrin their investigation hit a dead end because his daily conduct did not evidence any concrete steps in committing a single crime. To this end the government knew where Mr. Calloway lived, where he worked, who he was friends with, the nature of his relationship with his mother, siblings and wife. They knew he was divorced. Having fully followed and investigated his life, the government could not point to anything criminal beyond his distasteful words and praise for an insidious leader. But support for racist ideology or praise for vile human beings are not crimes. His reckless and ill-advised statements were far from "true threats". After repeatedly failing to unearth something criminal, the FBI went into overdrive and their mission became how to put a firearm in Mr. Calloway's hands[1]. Confronting an armchair extremist with no influence they sought and succeeded in bringing the crime to him, literally to his door steps.

**1. The Government's Request for a 4-Level Enhancement to the Guideline Calculation is Not Supported by Law or Fact**

The facts of the case specifically undermine the notion that the AK-47 which had been effectively disarmed and provided without any live ammunition could have facilitated or had the potential of facilitating another offense. This was more so since Mr. Calloway handled the firearm for a mere thirty seconds before the firearm was retrieved by the same officers who Indirectly gave it to him. The evidence or lack thereof before the court fails to support a four-level enhancement pursuant to U.S.S.G. § 2K2.1(b)(6)(B).

---

[1] Since the Court is very familiar with the offense conduct from prior filings, Mr. Calloway's admission before the Court during the plea hearing and the offense conduct included in the Presentence investigation, there is no need to rehash that information.

Section 2K2.1(b)(6)(B) provides for a four-level enhancement if the defendant "used or possessed any firearm or ammunition in connection with another felony offense." U.S.S.G. § 2K2.1(b)(6)(B). The commentary to § 2K2.1 explains that possession of a firearm occurs "in connection with" another felony offense if it "facilitated, or had the potential of facilitating" the other offense. U.S.S.G. § 2K2.1(b)(6)(B), cmt. n.14(A). The Sentencing Commission amended Application Note 14 in 2014, pursuant to Amendment 784. That amendment changed Note 14's caption from "In Connection With" to "Application of Subsections (b)(6)(B) and (c)(1)." See United States Sentencing Commission Guidelines Manual, Supplement to App. C, Amendment 784, p. 1819. It also added, at the end of Note 14, the following language:

(E) *Relationship between the Instant Offense and the Other Offense*.-- In determining whether subsections (b)(6)(B) and (c)(1) apply, <u>the court must consider the relationship between the instant offense and the other offense</u>, consistent with relevant conduct principles. *See* §1B1.3(a)(1)-(4) and accompanying commentary. (emphasis added)

Note. 14 (C) calls into question the applicability of § 2K2.1(b)(6)(B). In determining whether § 2K2.1(b)(6)(B) applies, "the court must consider the relationship between the instant offense and the other offense." U.S.S.G. § 2K2.1(b)(6)(B), cmt. n.14(E). When Mr. Calloway received the firearm, the offense of using the firearm was one of many comments he made months or years earlier into the void of social media on three separate Facebook accounts or to a confidential informant. The statements were made without any gravitas, planning or detail. The lone case the government cites from 1995 doesn't survive the more recent case law and the amendment that directly relates to this enhancement. See <u>United States v. McDonald</u>. 165 F.3d 1032 (6th Cir. 1999) (requiring a distinction of conduct between the offense of conviction and the other felony offense); <u>United States v. Sanders</u>, 162 F.3d 396, 400 (6th Cir. 1998)

5

"[requiring]as a condition precedent to the application of a major four level guideline enhancement, a finding of a separation of time between the offense of conviction and the other felony offense, or a distinction of conduct between that occurring in the offense of conviction and the other felony offense); United States v. Harris, 429 Fed. Appx. 269, 270 (4th Cir. 2011)(requiring the government "to prove more than the mere presence of the firearm []to also prove that [defendant's] possession of the firearm facilitated or had the tendency to facilitate [the other felony]) United States v. Blount, 337 F.3d 404, 406 (4th Cir. 2003)(the provision is not intended to apply to defendants who commit "a separate felony offense that is rendered more dangerous by the presence of a firearm.") The "requirement is satisfied if the firearm had some purpose or effect with respect to the other offense, including if the firearm was present for protection or to embolden the actor." United States v. Jenkins, 566 F.3d 160, 162 (4th Cir. 2009) (citation and internal quotation marks omitted). Because there is no evidence from which to determine that the firearm was possessed in connection or with intent to commit the District of Columbia Assault with a Deadly Weapon, the Court should not imposed the four-level enhancement to Mr. Calloway's offense level.

2. **The Government seeks a severe punishment by conflating Mr. Calloway's protected speech and the "other offense"**

"[T]he bedrock principle underlying the First Amendment... is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." Texas v. Johnson, 491 U.S. 397, 414 (1989). The Government's sentencing is overwhelmingly based on Mr. Calloway's statements on Facebook and statements that he made to the confidential informant. In fact the Government's Orwellian investigation of Mr. Calloway

was motivated by his political, religious, and racial views. Their denouement for the most severe penalty is nothing less than an attack and condemnation on Mr. Calloway's fundamental right to free speech. The First Amendment prohibits the Government from proscribing speech or expressive conduct if the Government disapproves of the ideas expressed. R.A.V. v. City of St. Paul, Minn., 505 U.S. 377, 382 (1992).

> "The rationale of the general prohibition, after all, is that content discrimination 'raises the specter that the Government may effectively drive certain ideas or viewpoints from the marketplace.' *Id.* at 387.

Beyond Mr. Calloway's momentary illegal possession of the firearm, the government cannot point to any concrete steps taken by him to support their exaggerated claims that he was going to "commit mass murder" and "destroy our society". Mr. Calloway's statement on the internet including his praise for ISIS and Abu Baghdati on social media and to the confidential informants are protected speech. Mr. Calloway, as any other citizen has a right to make statements however distasteful they may be. Regrettably, the government is unwilling to appreciate First Amendment precedent and insists on using Mr. Calloway's statements to secure an unreasonable and unjustifiable sentence. Mr. Calloway is not before the Court charged with making threats, inciting riots, or any other unprotected speech. Yet the crux of the government's argument in support of a maximum sentence is because of what he said. In focusing on what he said, they cleverly endeavor to minimize that the crime was only completed with their concrete assistance in supplying the firearm and their well-compensated informants.

Only speech that is a "true threat" can be punished. In order to prove that a threat was a "true threat" the Government must prove that the defendant subjectively intended the statement to be taken as a threat and also needs to prove that a reasonable listener objectively would have

perceived it as a threat. There is no evidence that Mr. Calloway's speech reached the level of a legitimate or "true" threat. See United States v. Shehadeh 2013 WL 6049001, at 4 (E.D.N.Y.,2013)

> the Court does not find the fact that Shehadeh created and administered websites regurgitating certain violent jihadist propaganda to be an appropriate basis for punishment consistent with the First Amendment. Nor does the Court believe that maintaining these websites constitutes "criminal conduct," as it must to trigger the enhancement under § 4A1.3.

The Government's Request for a maximum prison sentence is inherently unfair, flawed, vindictive and premised on suppressing speech while failing to distinguish between true threats. In support of a maximum sentence the government has attached the government's sentencing memorandum in United States v. Wehelie, 1:16-CR-162 (E.D. Va. July 14, 2017). But that case has significant differences that the government conveniently omits. Unlike Mr. Calloway's possession of the AK-47 which lasted no more than thirty seconds, Wehelie transported four 9 mm automatic pistols with can-style suppressors and eight 20 round magazines across the state lines from Maryland into Virginia. Wehelie also identified specific plans and locations he would target. What the government fails to inform the Court is that, initially the Wehelie prosecutors sought a sentence of 46 months. Id. ECF 36. In advocating for a prison sentence of forty-six months the government averred that

> "In addition, he did all of this in the context of his discussions with the UCE about wanting to get a gun for himself. And *those* discussions preceded his threatening comments about wanting to get an AK-47 and "empty the clip" during an attack on a military recruiting station if he was prevented from traveling overseas to join ISIL. The defendant made those threatening comments just a few weeks after he possessed the four high-powered firearms. And significantly, his plan to attack a military recruiting station also involved the use of firearms. Clearly the defendant was not at all deterred by his felony conviction from possessing and using firearms. And in fact, the defendant was

>ordered detained in this case, in large part, due to these very chilling comments. (Wehelie Detention Transcript July 13, 2016, Attached). Given all of
>this information, this was a serious offense." Id. At 7-8.

It was only after the District Court signaled that it was considering an upward departure that the government abandoned their position that a 46 month sentence was a "strong sentence".

The government's focus on words and not their own conduct amounts to a full embrace of sentencing entrapment and manipulation. In United States v. Mack, 841 F. 3d 514, 524 (D.C. Cir. 2016), the D.C. Circuit recognized that both sentencing manipulation and sentencing entrapment are no frivolous arguments that require a district court response. Citing United States v. Torres, 563 F.3d 731 (8th Cir. 2009), the D.C. Circuit defined sentencing manipulation as an unfair exaggeration of the defendant's sentencing range by the Government. Id. at 523. The government request for a maximum sentence is built on exaggerations and manipulation.

### 2. Mr. Calloway's History

The instant offense represents Mr. Calloway's sixth criminal conviction. However, in the context of his life, and not just his criminal record, the instant crime is an anomaly. The instant offense represents Mr. Calloway's sixth criminal conviction. This conviction bears no resemblance to his conviction for a misdemeanor assault that took place eight years ago and the aggravated assault that took place sixteen years ago. The remaining four convictions are for traffic offenses for reckless driving and driving uninsured. The reckless driving adjudications are actually speeding violations. All of his convictions yield four criminal history. That total barely places Mr. Calloway in Criminal History Category III. That criminal history completely belies

the government's repeated but hollow exhortations of Mr. Calloway's dangerous. E.g. Gov Sentencing Mem at 29, Mr. Calloway is "a convicted felon with a history of violent crime". A single simple assault conviction and a sixteen year old aggravated assault does not evidence a "history of violent crime".

Far from the monster that the government obsessively seeks to falsely portray, Mr. Calloway's history is one of a person who has a work history, who served his country for four years, and who struggled and persevered through a devastating childhood trauma and through his own mental health struggles. Regardless all of that is either ignored, dismissed, or relegated to nothingness by the government. Instead the government's hyperbole is only equaled by exaggerated outrageous claims e.g. Mr. Calloway's "effort to commit mass murder"; that he communicated to "his Facebook followers (and to any future investigators"); that he had "a fully automatic AK-47 assault rifle with approximately 90 rounds of ammunition."). If the government is so sure of its evidence regarding mass murder, it begs the question why they chose an assault with a deadly weapon as supposed to a more serious felony. If Mr. Calloway had 90 rounds of ammunition why he wasn't charged with a separate count of possessing ammunition. At a minimum it should be expected that the government would not play or manipulate the facts. Simple honesty should not be so hard to come by.

In looking at Mr. Calloway's history, his life has been divided into distinct periods. Up until he was six years old he was raised by two loving parents who provided a nurturing home. That changed when as a six year old, a mere first grader he had to confront his father's suicide. Mr. Calloway was never the same again. The carefree happiness of a first grader essentially turned into bitterness, depression, and an inability to fully comprehend what had transpired. To

go from one day of having a father to the next day and no longer seeing him was in every way traumatic.

Remarkably, Mr. Calloway the young boy who later became afflicted by the mental illnesses that was pervasive in his family became a teenager who did not act out his depression and loneliness. Mr. Calloway did not express public display of anti-social conduct. He was not a fixture in the family division. Yet, his mental struggles were so apparent that his stepfather, Larry Brown, would later relate how he had "some psychological problems". But Mr. Brown had a clear memory of Mr. Calloway being "a very nice person". Notwithstanding his mental illness, which would be diagnosed as Bi-polar disorder, Mr. Calloway finished his studies and graduated from High School. The next important phase in Mr. Calloway's life was his decision to volunteer with the United States Marine Corps[2].

**Mr. Calloway's service with the United States Marine Corps**

Mr. Calloway made the decision to serve his country even before he had graduated from high school. Mr. Calloway was seventeen years old when he made that decision. Recruiters had approached him in high school, but it was his father's experience in the military that really influenced him. Mr. Calloway read a book series about Vietnam in 1996. His uncles and cousins

---

[2] Evidence about a defendant's disadvantaged background is relevant because of the belief "long held by this society, that the defendants who commit criminal acts that are attributable to a disadvantaged background or to emotional or mental problems may be less culpable than defendants who have no such excuse." Boyde v. California, 494 U.S. 370, 382 (1990). A defendant's tragic personal history is relevant to sentencing. See United States v. Lopez, 938 F.2d 1293, 1297-99 (D.C. Cir. 1991)

were also Marines. He enlisted during high school and left on a bus for Boot Camp only two weeks after graduation.

His first three months were tough ones, spent in the heat and humidity of Parris Island, South Carolina. Mr. Calloway will never forget seeing another Marine recruit, a young black man from Kentucky, succumbing to the pressure and killing himself after grabbing another man's gun. The training officers discontinued training for two days when that happened. That suicide weighed heavily on Mr. Calloway to the point that when "Boot Leave" occurred after graduation in September, he didn't celebrate. Mr. Calloway stayed home during the entire ten days. Boot Camp overall was traumatizing and the suicide was the most difficult to bear for reasons that it was trauma that he was intimately familiar with.

Immediately after that, Mr. Calloway went to Camp Geiger for Infantry School for two months where he trained to fight in combat. By December of 1997, Mr. Calloway was in Fleet Marines, helping to serve the Navy forces in Jacksonville, NC, at Camp LeJeune. Mr. Calloway was "hazed" by being given extra duty. In 1998, Mr. Calloway was deployed to the Mediterranean for six months on the USS Tortuga. His role was to serve as an armed guard for the ship. That deployment took them to Spain, Greece, Tunisia and Italy.

In 1999, he began a three month deployment to Panama. One of his missions was patrolling the jungle protecting Howard Air Force Base. Mr. Calloway was a "Special Weapons" Infantryman. He recalls that patrol as especially stressful because his group was the last group to patrol there before the United States returned the Panama Canal. At the time, Mr. Calloway was the only black man in their group and the environment was very racist. He recalls many racist

taunts, particularly from an Infantryman from Texas. During night patrol in the jungle, Mr. Calloway and his group saw FARC rebels on a regular basis.

From June through December of 1999, Mr. Calloway was back at Camp LeJeune, and then took one month leave to go home. In January of 2000, he went back to the Mediterranean for another six months, this time to Spain, Italy, Greece, Tunisia, Turkey and Croatia. That February, he participated in a mission "Operation Show of Force" in Croatia.

Part of Mr. Calloway's assignment there was to assist in the landing of helicopters onboard the ship USS Ashland. This was extremely difficult and dangerous work because of high winds and snipers. The military added combat pay for any Marine willing to do it. Navy Seals were also on board during this mission, involved in an operation to stop Milosevic from invading Croatia again. The USS Cole was part of his fleet. The night before the infamous USS Cole bombing, the USS Cole assisted them in fighting off the Serbs.

Following this deployment, Mr. Calloway was in a field operation for one month and continued to train. The daily rigorous routine involved 12 miles with boots and utility. He would run seven miles and jog five. One day as they were running along, Mr. Calloway suddenly realized they had run into a minefield. He and the others stopped immediately and slowly began to retrace their steps out. It seemed as if it took forever to work their way back out but they managed to do so successfully.

The rest of Mr. Calloway's time in the Marines was spent back at Camp LeJeune. He was never fully debriefed following his time in the Marines and he began to struggle after returning home. After being honorably discharge, Mr. Calloway returned to Washington, D.C.

The emotional toll of his marine life created significant hardships in his personal life. Mr. Calloway was not prepared to traverse seamlessly from a career involved in dangerous missions to begin life as a civilian. Like his father and other family members, Mr. Calloway suffered from the same mental illnesses that wrought havoc on his relatives. His depression became more prevalent when his mother was diagnosed with Lymphoma in 2001. She died shortly thereafter and her last prescient words to him were, "Are you okay?"

### Mr. Calloway's employment history

Mr. Calloway has been consistently employed since the time he was in the United States Marines. As such he's had generally uninterrupted employment since he was eighteen years old. Throughout his adult life he's worked as a laborer, as a sanitation worker, and has found gainful employment in government agencies, in restaurants, and in construction sites. In all of his employments, he never had a problem with colleagues or supervisors. In fact his last supervisor at Dynamics Contracting, Inc. informed the probation officer that "Mr. Calloway was a responsible employee, always showed up to work on time and did as he was told. We never encountered any issues with him." PSR paragraph 87.

His job as a laborer was physically demanding but he always made it to work notwithstanding that he periodically had to contend with depression. That he maintained a decent job for a four years is noteworthy since he had to pick himself up after surviving a knife attack. Mr. Calloway was attacked with a knife in a store parking lot. After being stabbed 4 or 5 times, he lost consciousness. His time in the hospital and recovery cost him his job. He became depressed due to his unemployment and the pain from his injuries and he began to use drugs to deal with his depression.

By 2007, Mr. Calloway was homeless. He was prescribed medication in the V.A. Hospital and was on his meds until 2008 when he went into the Bureau of Prisons for eight months. It was then that his grandmother died. After being released from prison, Mr. Calloway worked very hard for eight years to regain everything he had lost: a job, an apartment, clothes, furniture, and small possessions that he bought with his modest earnings. Mr. Calloway, developed a strong work ethic in high school and he has carried that with him throughout his life. Being employed has been a constant in his life. He's never felt the need or the pull of living of the government or looking for handouts. His arrest in May 2017 marked the second time that the modest life that he had built for himself he lost once again.

## 2. The purpose of Sentencing

### a. The Sentence should reflect the Seriousness of the Offense

Mr. Calloway recognizes that the Court must impose a sentence that reflects the seriousness of the offense, promotes respect for the law, and provides just punishment. While the sentence must provide deterrence and protect the public, it must also provide Mr. Calloway with educational and vocational training and medical care. In balancing all of the purposes of sentencing, the Court has to strike the appropriate balance between the punitive sanction, protection for the community and the long term goal of rehabilitation.

A guideline prison sentence adequately addresses the seriousness of Mr. Calloway' conviction. In view of Mr. Calloway's history, his military service, gainful employment history and mental health struggles the applicable guideline range fully address the statutory factors enumerated in 18 U.S.C. § 3553(a). The critical question is whether the requested prison sentence of thirty-seven months "promote[s] respect for the Law and provide[s] just

punishment." A combined prison and supervision sentence that encumbers Mr. Calloway for six years adequately satisfies the sentencing purposes set forth in 18 U.S.C. § 3553(2)(a).

### b. The Sentence Should Afford Adequate Deterrence to Criminal Conduct

A prison sentence of thirty-seven months followed by three years of supervised release can adequately protect the public and achieve sufficient deterrence. Supervised release will require a sustained commitment to responsible behavior. Supervision will subject Mr. Calloway to a strict regimen which will include reporting to a probation officer, submitting monthly financial reports, and mandatory drug testing. Furthermore, he will be required to report any change in his residence, or employment outside of the metropolitan area. These are requirements that he will have to obey and that will be part of his life under supervision. With a strict supervision regimen the likelihood of recidivism will diminish and the public will be protected.

Since his case has been pending Mr. Calloway has come to appreciate why he needs to respect the law. This new found respect is the result of many factors related to his criminal case. The most obvious is the fact that he's been incarcerated for approximately twenty months. He has also come to terms with the hateful ideology that he embraced and championed on social media. Taking up such a foreign and violent ideology is something that is inconsistent with the productive life he has generally led.

### c. The Sentence Should Provide the Most Effective Rehabilitation Treatment

18 U.S.C. § 3553(a)(2)(D) directs the Court to fashion a sentence that provides Mr. Calloway with necessary "medical care" or other "treatment in the most effective manner." The Sentencing Reform Act promoted the identical goal in a non-custodial setting by"reject[ing] imprisonment as a means of promoting rehabilitation." Mistretta v. United States, 488 U.S. 361,

16

367 (1989)Tapia v. United States, 131 S. Ct. 2382, 2384 (2011) There is no doubt that Mr. Calloway needs counseling and treatment to address his mental health struggles. With appropriate training and treatment the likelihood of recidivism will be significantly reduced. While in custody, Mr. Calloway has shown hopeful signs for long term rehabilitation. Mr. Calloway is committed to taking advantage of every therapeutic and vocational program available in the Bureau of Prison.

Conclusion

Mr. Calloway is a decent and well-meaning person, who experienced a terrible childhood trauma. Thereafter he had suffered from mental illnesses and the continuing loss of his father. In the face of those struggles he persevered and graduated from high school. Thereafter he served his country for four years. Since he was honorably discharged, Mr. Calloway has demonstrated that he is a resourceful and productive minded person. Upon his release from prison, Mr. Calloway has every intention of resuming a productive life that is based on honest labor. Equally important he wants to follow through with his rehabilitation. Mr. Calloway fully regrets his descent into the awful ISIS ideology. He realizes how wrong he was in following such an evil minded movement. Regrettably, Mr. Calloway is among many who were seduced by ISIS's perverted religious philosophy. Mr. Calloway has moved on from that terrible episode in his life.

Mr. Calloway asks the Court for leniency and to reject the government's unfair sentencing request based on his work history and military service. Leniency for someone like Mr. Calloway has been recognized by our highest court. In Porter v. McCollum, the Supreme Court stated in a per curiam opinion, "Our nation has a long tradition of according leniency to veterans in recognition of their service, especially for those who fought on the front lines as

Porter did." 130 S.Ct. 447, 455 (2009). Because Mr. Calloway fulfilled his duty to the United States Marine Corps and to his country, he is deserving of mercy and leniency.

        Respectfully submitted,
        A.J. KRAMER
        FEDERAL PUBLIC DEFENDER


        _____/s/_____
        Carlos J. Vanegas
        Assistant Federal Public Defender
        625 Indiana Avenue, N.W. Suite 550
        Washington, D.C. 20004
        (202) 208-7500