```
 1                    BEFORE THE UNITED STATES DISTRICT COURT
                          FOR THE DISTRICT OF COLUMBIA
 2

 3    UNITED STATES OF AMERICA,         .
                                        .  Case Number 17-cr-89
 4              Plaintiff,              .
                                        .
 5         vs.                          .
                                        .  Washington, D.C.
 6    CLARK CALLOWAY, JR.,              .  February 4, 2020
                                        .  11:23 a.m.
 7              Defendant.              .
      - - - - - - - - - - - - - - - - -

 8

 9                     TRANSCRIPT OF EVIDENTIARY HEARING
                      BEFORE THE HONORABLE EMMET G. SULLIVAN
10                        UNITED STATES DISTRICT JUDGE

11

12    APPEARANCES:

13    For the Government:        JEFFREY PEARLMAN, AUSA
                                 TEJPAL CHAWLA, AUSA
14                               United States Attorney's Office
                                 555 Fourth Street Northwest
15                               Washington, D.C. 20530

16
      For the Defendant:        CARLOS VANEGAS, AFPD
17                               Federal Public Defender's Office
                                 625 Indiana Avenue Northwest
18                               Suite 550
                                 Washington, D.C. 20004
19

20

21    Official Court Reporter:   SARA A. WICK, RPR, CRR
                                 333 Constitution Avenue Northwest
22                               U.S. Courthouse, Room 4704-B
                                 Washington, D.C. 20001
23                               202-354-3284

24

25    Proceedings recorded by stenotype shorthand.
      Transcript produced by computer-aided transcription.
```

1                          C O N T E N T S

2

3                              TESTIMONY

4    ROBERT PARIS           Direct Examination................ 13
                            Cross-Examination................. 32
5                           Redirect Examination.............. 70

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1              P R O C E E D I N G S

2        (Call to order of the court.)

3              THE COURT:  Counsel, I know we have a witness who is

4   in the back.  Why don't we do this:  Can I get a proffer as to

5   what he is going to testify to before he comes out?

6        Mark, you want to call the case.  Mr. Calloway can come out

7   before the other witness comes out.

8              THE COURTROOM DEPUTY:  Your Honor, this is Criminal

9   Case 17-089, United States of America versus Clark Calloway.

10       Will parties please identify yourselves for the record.

11             MR. PEARLMAN:  Jeff Pearlman and Tejpal Chawla on

12  behalf of the government.

13             THE COURT:  Gentlemen, good morning.

14             MR. VANEGAS:  Good morning, Your Honor.  Carlos

15  Vanegas on behalf of Mr. Clark Calloway.

16             THE COURT:  Counsel, good morning.

17       Mr. Calloway, how are you doing this morning?

18             THE DEFENDANT:  I'm doing fine, Your Honor.

19             THE COURT:  Good.  Counsel?

20             MR. PEARLMAN:  First, I will cover the substance of

21  what he's going to testify to, and then I want to talk about

22  some of the procedural elements that brought him here just so

23  the Court is aware.

24       First, substantively, he is going to testify that while

25  incarcerated with Mr. Calloway, that he overheard Mr. Calloway
```

```
 1    make numerous statements in a TV room essentially while they're

 2    all watching TV, statements about wanting to kill white police

 3    officers, wanting to join ISIS, wanting to kill the cooperators

 4    against him, wanting to -- explaining why he wanted to mess up

 5    some police officers and attack the police in general, talking

 6    about ambushing police officers, a variety of topics, even going

 7    into the fact that he was upset with Meghan Markle for marrying

 8    a white person, so a lot of sort of comments of that nature,

 9    because he was incarcerated with Mr. Calloway at the time.

10               THE COURT:  All right.

11               MR. PEARLMAN:  So procedurally, I just want to bring a

12    couple of things to the Court's attention.

13               THE COURT:  Let me just say, the marshals were unaware

14    we had a witness incarcerated.  That's the reason for the delay

15    this morning.

16               MR. PEARLMAN:  And I apologize.

17               THE COURT:  No, not a problem.  Believe me.  The

18    downtime for me was perfect, but the marshals had to get some

19    additional marshals.

20               MR. PEARLMAN:  The reason why -- and this is

21    important, Your Honor.  The reason why Mr. Paris was

22    incarcerated at the same time as Mr. Calloway was because

23    Mr. Paris had pled guilty to voluntary manslaughter back in 2015

24    in D.C. before Judge Jennifer Anderson of D.C. Superior Court.

25    He at the time was represented by Kevin McCants.
```

1      After Judge Anderson gave him about 10 years of

2   incarceration, he moved under 23-110, D.C. Code 23-110 to attack

3   his conviction collaterally.  And he made -- he testified and

4   made some statements, and Judge Anderson in response made some

5   factual findings that I just want to make the Court aware of.

6      The main gist of his argument was that he was unaware that

7   Judge Anderson could move over the eight years that the

8   government was going to recommend, and he essentially understood

9   that everything was all agreed upon before the sentence was

10   going to happen, that it was a (C) plea, essentially, which it

11   wasn't.  And Mr. McCants testified that he was dealing with a

12   very competent guy in Mr. Paris and that he went over everything

13   with Mr. Paris.  Whereas, Mr. Paris testified that he was having

14   a lot of emotional problems at the time because he had

15   essentially run over somebody while high on PCP and was not

16   really in a good state to understand what the plea was all about

17   and further that Mr. McCants had essentially made

18   representations to him that it was a sealed deal or a (C) plea.

19      So when Judge Anderson sorted through all of this, she made

20   some factual findings.  And one of the things that she indicated

21   was that she did not credit Mr. Paris's testimony on the issue

22   of sort of his mental state being a basis for why he didn't

23   understand what was going on.  Among other things and just in

24   case the Court has any questions about this, she found that he

25   appeared very competent during the 23-110 proceeding, that

1    Mr. McCants never had any reason to ask for a competency

2    evaluation.  So she did not credit him on that issue.

3        And then the second thing was, she did not credit the --

4    and these are quotes.  She did not credit Mr. Paris on the issue

5    of not understanding that the Court could impose the sentence

6    that it wanted to within the statutory framework because it was

7    hammered home during the colloquy and it was in the plea

8    agreement itself.

9            THE COURT:  And I assume he signed the plea agreement.

10           MR. PEARLMAN:  He signed the plea agreement.  So

11   whether you read "I don't credit" -- I think that can be

12   relatively innocuous, or it can be something else.  But I just

13   want the Court to be aware of it, because that is the language

14   that was used.

15           THE COURT:  All right.  How much time elapsed between

16   the plea colloquy and the 23-110 hearing?

17           MR. PEARLMAN:  So at the time of the hearing, that

18   would have been about three years.

19           THE COURT:  Three years?  All right.  So he was then

20   serving his sentence?

21           MR. PEARLMAN:  At that time, yes, he was serving the

22   sentence.

23           THE COURT:  Is he still serving the sentence now?

24           MR. PEARLMAN:  He is still serving the sentence.

25           THE COURT:  Okay.  Did she issue a written order,

1    Judge Anderson?

2                  MR. PEARLMAN:  I don't know that she issued a --

3                  THE COURT:  You have a transcript?

4                  MR. PEARLMAN:  Yeah, we do have a transcript.

5                  THE COURT:  I think the relevant portions of the

6    transcript should be made a part of the record here.

7                  MR. PEARLMAN:  Yes.  And I actually have a copy of

8    excerpts of the April 13th, 2018, hearing where Judge Anderson

9    made some of those statements, and I can provide that to the

10   Court.

11                 THE COURT:  Is this new information to defense

12   counsel?

13                 MR. PEARLMAN:  Yes, we had already provided that

14   information to defense counsel.  We provided the entire

15   transcript.

16                 THE COURT:  So the answer is no, it's not new today?

17                 MR. VANEGAS:  That's correct.

18                 THE COURT:  When I said "new information," I meant are

19   you hearing it for the first time today, and I think the answer

20   is no.

21                 MR. VANEGAS:  That's correct.  They provided it to me.

22                 MR. PEARLMAN:  So with those two matters, unless the

23   Court has something else, we are prepared to call --

24                 THE COURT:  Just one comment.  Did anyone read the

25   article in Saturday's Post about the sentencing before Judge

1    Hazel in Maryland?

2              MR. PEARLMAN:  What --

3              THE COURT:  It's related, not related in the legal

4    sense, but the issues were almost identical between -- with the

5    issues in this case.  That is, someone who was an avowed white

6    nationalist for 30 years or so was convicted of having an

7    arsenal of weapons in his home and making statements about

8    killing people, et cetera, et cetera.  And actually, there was

9    an expert called by defense counsel on the topic of risk

10   assessment, which is unlike what we have in this case, but the

11   judge rejected the expert testimony, enhanced the sentence.  But

12   it was a very interesting article about the problems the

13   government faces because of the inability to charge someone with

14   domestic terrorism.

15        Is that something Congress is looking at?

16              MR. PEARLMAN:  I think that is something that DOJ

17   looks at very closely, domestic terrorism, particularly in the

18   context of the last few years in the cases that the FBI

19   investigates.  But frequently, as with that case, I think it

20   involved a Coast Guard person.

21              THE COURT:  Yeah, he worked at the Coast Guard for

22   years.

23              MR. PEARLMAN:  Or this case or other cases in which

24   the FBI has certain suspicions but the person ends up getting

25   arrested on something completely different and then we just go

1    with that.

2             THE COURT:  Because these are complicated -- Congress

3    ought to take a hard look at the pros and cons of whether or not

4    there should be a chargeable offense and let a jury make these

5    determinations.  We've had four or five hearings.  It's very

6    complicated, and the stakes are high if the Court finds a bases

7    for the enhancements, but it comes down to a credibility

8    determination, and it's unclear whether a jury is in a better

9    position.  I don't know.  But it's complicated.

10            MR. PEARLMAN:  Well, so in this particular -- I agree.

11   And there's a long history of the FBI and domestic terrorism

12   investigations, some of which Your Honor is probably aware.

13            THE COURT:  No, I'm not actually.  This is the first

14   time this issue has ever come before me in all these years.  But

15   I've spent a lot of time with the binder thinking about this

16   issue, talking with my staff.  I didn't call up Judge Hazel.  I

17   know him well.  I figured he couldn't elaborate on anything more

18   than what was in the newspaper.  He made essentially a

19   credibility determination and rejected the expert and enhanced

20   the sentence by at least 50 percent of what the government was

21   requesting.  But I thought it was a very interesting article.

22   I'm sorry I don't have a copy.  But you saw it?

23            MR. PEARLMAN:  I did see it, yes.  It used to be AUSA

24   Hazel.  So I know --

25            THE COURT:  Oh, in Greenbelt?

1          MR. PEARLMAN:  Yes.

2          THE COURT:  So you worked with Judge Hazel?

3          MR. PEARLMAN:  When he was an AUSA.  We were on the

4     same team.

5          THE COURT:  I have a high regard for him.  You read

6     the article, Counsel?

7          MR. VANEGAS:  Yes, Your Honor.

8          THE COURT:  Did you want to say anything about it?  I

9     just thought it was interesting.  It's not authority for

10    anything, but I thought it was very interesting and highlights a

11    very serious problem, and it is a problem in making these

12    determinations as to whether -- we're taught that if someone

13    says something, say something.  We're taught that words matter.

14    And these are complicated issues.

15         But on the other hand, you know, when you're driving down

16    the street and someone turns in front of you and cuts you off or

17    a cyclist gets in the lane of a car, people get mad, roll the

18    window down, and say terrible things.  Do they mean to act on

19    those things?  I think sometimes people do, but then determining

20    who is really going to act on it and who was just mad, it's very

21    difficult.

22         MR. VANEGAS:  Yes, Your Honor.

23         THE COURT:  Maybe it's a cop-out for me to say that

24    the jurors are in a better position to make that determination

25    as opposed to a professional factfinder.  But it's a very

1    interesting issue, but the stakes are very high, too.

2    MR. VANEGAS:  Yes, Your Honor.  I actually referenced

3    that case in a sentencing supplement, because that gentleman

4    actually had an arsenal.

5    THE COURT:  Oh, he did, right.  But then someone would

6    make the argument, I'm sure the government will at the

7    appropriate time, if Mr. Calloway is concerned about protecting

8    himself, why does he need an assault weapon?  Why does he need a

9    weapon of war as opposed to a handgun?  Not that it would have

10   been legal to have a handgun purchased on the black market.  But

11   an AK-47, what's a legitimate purpose of AK-47s?  The NRA would

12   say they're hunting weapons, which is nonsense.  They're weapons

13   of war.  Anyway, I'm getting far afield here.

14   Now, we're not going to proceed to sentencing today.  You

15   know that?

16   MR. PEARLMAN:  I saw the order.

17   THE COURT:  I thought this was important enough to

18   devote time and attention to this issue today and to factor all

19   that into the sentencing proceeding.  We will pick a new date

20   for that.

21   Would you like to call your witness, Counsel?

22   MR. PEARLMAN:  Yes, sir.  If the marshals could get

23   Mr. Paris for me.

24   THE COURT:  Sure.  Let me thank the Marshals Service.

25   I know it's difficult to find extra marshals on short notice.  I

1    know that, because I was on the security committee for a brief

2    period.  So I know how difficult it is.  I know all the

3    challenges that you have.  So thank you very much.

4              MR. PEARLMAN:  Does Your Honor know Mr. Eaton, Terry

5    Eaton?  He is the lawyer who is representing Mr. Paris.

6              THE COURT:  Oh, hi.  I thought I recognized you.  How

7    are you today?

8              MR. EATON:  I'm well.

9              THE COURT:  You're the attorney for this gentleman?

10             MR. EATON:  Mr. Paris, yes, Your Honor.

11             THE COURT:  Do you want to sit in the well of the

12   court?  You can.

13             MR. EATON:  Thank you, Your Honor.

14             THE COURT:  Absolutely.

15          ROBERT PARIS, WITNESS FOR THE GOVERNMENT, SWORN

16             THE COURT:  Good morning, sir.  How are you?

17             THE DEFENDANT:  How are you doing?

18             THE COURT:  Very good.  And you?

19             THE DEFENDANT:  I'm all right.

20             THE COURT:  Let me ask counsel, if it's okay with the

21   marshals, in the past I have allowed counsel for people who are

22   incarcerated to sit in the jury box.  I don't know if you have

23   objections you plan to make or not.  I just don't know.  I don't

24   want you at a disadvantage, because he's got the right to an

25   attorney here.  Are there any Fifth Amendment issues?

1          MR. EATON:  None that I'm aware of at this time, Your

2     Honor.

3          THE COURT:  Any Fifth Amendment potential?

4          MR. PEARLMAN:  Not that I'm aware of.

5          THE COURT:  If it's okay with the marshal, can he sit

6     there, or would you prefer him sitting there?  Marshal, is it

7     okay with you if the attorney sits over there?  Whatever you say

8     is fine with me.  Okay.

9        Do you want to sit over there?  Sure.

10        All right, Counsel.  Go right ahead.

11                          DIRECT EXAMINATION

12          BY MR. PEARLMAN:

13     Q.   Good morning, sir.

14     A.   Good morning.

15     Q.   In a loud, clear voice, can you state your name for the

16     record, and can you spell your first and last name, please.

17     A.   My name is Robert Paris.

18     Q.   And how do you spell Robert, and how do you spell Paris?

19     A.   R-o-b-e-r-t P-a-r-i-s.

20     Q.   And Mr. Paris, you are currently incarcerated?

21     A.   Yes, sir.

22     Q.   Okay.  I want to talk briefly about why you're incarcerated

23     first.  Okay?

24     A.   Yes.

25     Q.   Okay.  On July 14th, 2015, were you driving a vehicle?

```
 1   A.    Yes, sir.

 2   Q.    Were you under the influence of something?

 3   A.    Yes.

 4   Q.    And did you strike a woman who you later knew as Tomika

 5   Early?

 6   A.    Yes, sir.

 7   Q.    And did you kill Ms. Early?

 8   A.    Yes, sir.

 9   Q.    And were you arrested for that?

10   A.    Yes, sir.

11   Q.    Did you go before a judge --

12              THE COURT:  If I could stop you for a second.  There

13   are no appeals pending from that 23-110 hearing, are there?

14              MR. EATON:  No, Your Honor.  The Court of Appeals

15   affirmed Judge Anderson's ruling earlier in 2018.

16              THE COURT:  2018?  Did the Court of Appeals issue an

17   opinion?

18              MR. EATON:  Yes, a written opinion.

19              THE COURT:  Okay.  Not a memorandum opinion and

20   judgment?

21              MR. EATON:  It was an unpublished memorandum.

22              THE COURT:  Unpublished.  All right.  Do we have a

23   copy of that, Counsel?

24              MR. PEARLMAN:  So I do not have a copy with me, but I

25   can certainly get one for the Court.
```

1          THE COURT:  I would like to make that a part of the

2     record as well.

3          MR. EATON:  I have it.

4          THE COURT:  At some point if you can give it to

5     Mr. Coates, and we can make that a part of the record.

6      Any objection to that, Counsel?

7          MR. VANEGAS:  No, Your Honor.

8          BY MR. PEARLMAN:

9     Q.   Sir, were you assigned Judge Jennifer Anderson as a judge?

10    A.   Yes, sir.

11    Q.   And did you plead guilty on September 3rd, 2015, to

12    voluntary manslaughter?

13    A.   Yes, sir.

14    Q.   And did you also plead guilty to driving under the

15    influence under D.C. Code 50-2206.11?

16    A.   Yes, sir.

17    Q.   And was that pursuant to what is called an Alford plea?

18    A.   Yes.

19    Q.   And so were you sentenced on November 20th, 2015, to 10

20    years of incarceration for the manslaughter with the DUI to run

21    concurrent?

22    A.   Yes.  It was like 125, five more months on the 10 years.

23    Q.   Okay.

24          THE COURT:  Let me stop you for a second, Counsel.

25          Just so the record is clear, if it was an Alford plea -- I

```
 1    haven't had one of those in years, but my understanding, my
 2    recollection is that by pleading to that, what a person is
 3    actually saying is that I recognize the government's evidence is
 4    strong and that a jury would probably convict me if it heard the
 5    evidence.  Am I correct?  It's not verbatim Alford, but --
 6              MR. PEARLMAN:  Yes, it is something to that effect,
 7    that he is recognizing the strength of the government's case,
 8    usually associated with some sort of limited knowledge.
 9              THE COURT:  All right.  So he didn't actually plead
10    guilty to the offense, did he?
11              MR. PEARLMAN:  I don't want to mince words, Your
12    Honor.  He was -- he agreed to be convicted of the offense.
13              THE COURT:  All right.
14         Because of the strength of the government's evidence; is
15    that correct?
16              THE WITNESS:  Yes, sir.
17              THE COURT:  All right.
18              BY MR. PEARLMAN:
19    Q.   Now, even though you were sentenced back in 2015, were
20    there times that you returned to the D.C. jail?
21    A.   Yes, sir.
22    Q.   And were there times in 2018 that you were at the
23    D.C. jail?
24    A.   Yes, sir.
25    Q.   And did you return to the D.C. jail in part because you had
```

1    a 23-110 proceeding with respect to your sentence and the plea?

2    A.   Yes, sir.

3    Q.   And when I say, actually, "return to the D.C. jail," that

4    would be returned from Bureau of Prisons?

5    A.   Yes.

6    Q.   And in 2018, do you recall where you were housed at the

7    D.C. jail?

8    A.   I was in northeast 3 of the D.C. jail, the 50 and over, and

9    then all of a sudden, we all got moved to CTF because of the

10   heat.  It was too much heat over there.  So they sent us over to

11   CTF.

12   Q.   It was too hot?

13   A.   Huh?

14   Q.   It was too hot?

15   A.   Yeah, it was too hot, and two persons passed away because

16   of the heat where they had to close the block down, and they

17   sent us over to CTF and made that 50 and over.

18   Q.   I want to make sure I heard your words right.  You said "50

19   and over"?

20   A.   Yes.

21   Q.   So for individuals who were 50 and over like yourself?

22   A.   Yes, sir.

23   Q.   And during the time that you were in the over-50 block, did

24   you encounter anybody who is in the courtroom today?

25   A.   Yes, sir.

```
1    Q.   Who was it that you encountered?

2    A.   Mr. Clark.

3    Q.   And when you say Mr. Calloway, can you just point to an

4    item of clothing that he is wearing?

5    A.   Yes.  Right over there in the orange.

6              THE COURT:  Did you say Clark?

7              THE WITNESS:  Yeah, Clark Calloway.

8              THE COURT:  Oh, okay.  All right.

9              MR. PEARLMAN:  Would the record reflect an in-court

10   identification of Mr. Calloway?

11             THE COURT:  Any objection?

12             MR. VANEGAS:  No, Your Honor.

13             THE COURT:  The record will so reflect.

14             BY MR. PEARLMAN:

15   Q.   Now, at the time that you were jailed with Mr. Calloway, at

16   some point did you get in touch with your attorney, Mr. Eaton?

17   A.   Yes, sir.

18   Q.   Was he someone who was advising you in your appeal of the

19   23-110 case?

20   A.   No, sir.  My 23-110 was over with, and I was on the appeals

21   courts then.  That's when he was assigned to me.

22   Q.   I see.

23   A.   And that's when I talked to him.

24   Q.   And after you met with your attorney, did you agree to sit

25   down with the government and some FBI agents?
```

1    A.    Yes.

2    Q.    And was that around May 25th, 2018?

3    A.    Yes, around there.

4    Q.    Was your attorney present for that meeting?

5    A.    Not the first meeting.  The second meeting, he was.

6    Q.    Okay.  You don't remember him being at the first meeting?

7    A.    The first meeting?  No, I don't think so.  I don't know.

8    I'm not sure.  I know that I got there before he did it if he

9    did came.

10   Q.    Okay.  Let me ask you this:  Did you have a chance to

11   consult with Mr. Eaton while we were talking to you?

12   A.    Yes, sir.

13   Q.    And is that because he was present in the room?

14   A.    Yes.

15   Q.    When the government spoke to you, do you recall whether the

16   government made you any promises?

17   A.    Yes, they didn't make me no promise.

18   Q.    Did we promise that we would give you a lower sentence?

19   A.    No.  You said -- no.

20   Q.    Did the government and you discuss the possibility that

21   there could be what's called a Rule 35 motion in which the

22   government might make a motion for a reduction in your sentence

23   before Judge Anderson?

24   A.    Yes, sir.

25   Q.    Did we make any promises to do so?

1    A.    No, sir, you didn't.

2    Q.    And did you understand that ultimately it would be up to

3    Judge Anderson whether to grant such a motion?

4    A.    Yes, that's what y'all said.

5    Q.    During that meeting, did you indicate that you would be

6    interested in a shorter sentence than the one you're currently

7    serving?

8    A.    Yes, sir.

9    Q.    Okay.  Now, do you recall that you met with the government

10   in January of this year?

11   A.    Yes, sir.

12   Q.    So prior to January of this year, which would be January

13   2020, did you have any meetings with the government between May

14   2018 and January 2020 that you can recall?

15   A.    Say that again.

16   Q.    Okay.  So we met in May 2018; right?

17   A.    Yes.

18   Q.    Okay.  After we met in May 2018, do you recall the next

19   time that we met?

20   A.    It was this year.

21   Q.    Okay.  And was Mr. Eaton present this year when we met --

22   A.    Yes.

23   Q.    When the government met with you?

24   A.    Yes.

25   Q.    Now, sir, I just want to go over a little bit of your

1    criminal history briefly.

2    A.    Okay.

3    Q.    So the voluntary manslaughter that you pled guilty to was

4    not your first conviction?

5    A.    No, sir.

6    Q.    Okay.  You have several other convictions?

7    A.    Yes.

8    Q.    And those would include a robbery in Maryland from 1981?

9    A.    Yes, yes, armed robbery.

10   Q.    A couple of -- a drug conviction from Maryland in '96?

11   A.    Yes, sir.

12   Q.    A drug conviction from Maryland in 2000?

13   A.    Yes.

14   Q.    A DUI conviction in Maryland from 1999?

15   A.    Yes.

16   Q.    A no permit in D.C. in 2006?

17   A.    Yes.

18   Q.    A 2010 Maryland driving without a license and while

19   impaired?

20   A.    Yes.

21   Q.    And a 2012 DUI in D.C.?

22   A.    Yes.

23   Q.    All right.  So now I want to talk about why you're here

24   today.

25   A.    Okay.

1    Q.    How did you come to first meet Mr. Calloway?

2    A.    They were moving him into our block, and we were going to

3    go look at the TV in, they call it, the little room.  And it's

4    like nine people could fit in there.  We shut the door, and we

5    can hear the TV.  The other two TVs are in a big day room, and

6    you can't hear it because people are playing cards and talking

7    and doing this.  And I met him during the room that we be in

8    watching news and looking at sports.

9    Q.    So that I understand, you are indicating that you would go

10   into a sealed-off separate TV room which could hold about nine

11   people?

12   A.    Yes.

13   Q.    And there, inmates would watch TV?

14   A.    Yes.

15   Q.    Were you a cell mate of Mr. Calloway?

16   A.    No, sir.

17   Q.    Were you friends with Mr. Calloway?

18   A.    No, no, sir.

19   Q.    Were you enemies with Mr. Calloway?

20   A.    No, sir.

21   Q.    Did you at times -- did you say hello or good-bye to

22   Mr. Calloway?

23   A.    Yes, yeah, we would speak, say hi, yeah.

24   Q.    Say hello?

25   A.    Yeah.

1  Q.   Was it any deeper than saying hello and making eye contact?

2  A.   Just -- probably just telling him could we listen to the

3  TV, because he would be wanting to always talk, talking, and we

4  can't hear the TV.  We was telling him, Could you keep quiet?

5  And he'd just take control.  But that's all.

6  Q.   Did you ever talk to him -- did you ever have a

7  conversation with him about his case?

8  A.   No, sir.

9  Q.   When -- you were indicating that sometimes Mr. Calloway

10  would talk loudly; is that correct?

11  A.   Yes.

12  Q.   So I want to ask you about those things that he was talking

13  about.  Did he say anything in that room about his case?

14  A.   Yes, sir.

15  Q.   What did he say about his case?

16  A.   He said he was on a high-profile case.  He bought a machine

17  gun, and a bitch set him up, and he was going to kill that bitch

18  when he get out, like that.

19  Q.   You're using the term "bitch."

20  A.   Yeah.

21        MR. PEARLMAN:  And Your Honor, if it's okay if I can

22  ask frank questions and he can give frank responses?

23        THE COURT:  Sure.

24        BY MR. PEARLMAN:

25  Q.   Did he indicate whether a guy had set him up?

A.   He said bitch.  I don't know if it's a female or a guy.  He

just said, I'm going to kill that bitch for setting me up.

Q.   And did he say what he was going to do to this person?

A.   He was going to kill him.

Q.   Did he say anything about ISIS?

A.   Yes, he always bragged about ISIS.  Any time it come up on

TV, the same way we cheer, you know, making noise when the

Redskins make a touchdown and cheer and stuff, that's how he did

when ISIS is on TV or something.  He always get excited, and we

can't even hear the rest of the news.

Q.   How did he express his excitement of ISIS?  What kinds of

things did he say?

A.   Like he was excited when they ambush and kill somebody or

something.  He'd just get hype.  He'd just get hype off of

killing and, you know, keep talking about ISIS, them's his

people and all that.  I don't know what he means by it, because

I don't even know who is ISIS.  I just know he always talked

about them.

Q.   Did he say anything about wanting to join them?

A.   Yeah, he was always saying them his people, ISIS.  I don't

know if he was already connected with them or want to join.  He

just get real excited about ISIS.  I don't even know.

Q.   Were there other individuals of a Muslim faith who were

also in the 50s and over block?

A.   Yes, some Muslims was in there.

1   Q.   And when he would talk about ISIS, what would the other

2   Muslims do?

3   A.   They was -- it was like one more Muslim be in the room with

4   us, and he was like letting him know -- he would like say, Yeah,

5   you're right about this, but keep quiet, man, stop talking too

6   much, you're talking too much, stop, you know.  And he won't

7   keep quiet, though.  He just keep talking.  He wouldn't listen

8   to nobody.

9   Q.   Did he say anything about the possibility of how much

10  incarceration time he was facing?

11  A.   He said he was going to beat it because the police jumped

12  the gun too fast when he bought the gun.  They didn't let him

13  really buy more guns or whatever.  They just was so happy that

14  he got the gun when, you know, he was going to get a lot more

15  machine guns if they would have just waited.  He was just

16  bragging about that.

17  Q.   Did he indicate that he could face up to 10 years of

18  incarceration?

19  A.   No, I don't -- I didn't hear nothing about no time.  He was

20  just saying he was going to beat the case.

21  Q.   Okay.  Do you recall whether he indicated that 10 years

22  would not be enough?

23  A.   Not really.  If he did -- he might have said that back

24  then, but I'm not sure about that now.  I'm not sure.

25  Q.   If you're not sure about something, let's just assume

1    that's a no.

2    A.    I'm not sure, yeah.

3    Q.    Okay.  Did he indicate during these statements that he made

4    in front of the television whether he wanted to do harm to

5    anybody on the outside?

6          MR. VANEGAS:  Objection to leading.

7          THE COURT:  It's actually borderline leading.

8    Oftentimes, these questions that start off with the word "did"

9    can be troublesome.

10         What else did he say, if anything, about harming anyone

11   else?

12         THE WITNESS:  He was like bragging about killing white

13   people.  He just said something about white people he wanted to

14   kill.  We had about two or three more white boys, he was always

15   screaming on them, calling them names and telling them to get

16   their little stinking ass out of here and this and that.

17         And like when we would look at the news and somebody white

18   get killed, he would get happy and excited and stuff talking

19   about -- that's the way he is.  And he was talking about killing

20   policemen, too, you know.  There was a police in Baltimore that

21   got killed.  He was like, he would be clapping and just getting

22   all excited and saying, you know -- he said also the police

23   thought he was going to ambush 1st D, but he said they had it

24   all ass backward, he was talking about killing any policeman,

25   like that.  He was going to ambush them.

```
1              BY MR. PEARLMAN:
2    Q.   All right.  So I want to ask you a couple follow-ups to
3    what you just said.  You indicated -- was there some news about
4    a Baltimore female officer who was killed?
5    A.   Yes.
6    Q.   Okay.  And did he indicate anything when he saw that news?
7    A.   Yes.  He was just saying -- just clapping, like cheering,
8    like somebody just made a touchdown, you know.  He'd just get
9    real excited and stuff.
10            And then like -- it was a lot of incidents.  Like we would
11   come out of there and look at world news about police in New
12   York got ambushed.  They was going to a house on a domestic, and
13   the guy came to the door and just started shooting at them.  He
14   was like, Man, I could do more ambush than that because I've
15   been in the military, I know how to just lay outside and blend
16   in with the bushes, and they won't ever see me, and I can kill
17   them all, like that, you know, just bragging.
18            And we didn't want to hear all that, because we can't even
19   hear the news.  We watch 6:00 news, and if we didn't hear what
20   was on then, when world news come on at 6:30, we still won't be
21   able to hear that.  He would just take control of the room.
22   Q.   About how many times did he reference wanting to kill or do
23   harm to police?
24   A.   This happened like every day since he been on our unit.
25   And then all of a sudden, they moved everybody who wasn't 50
```

```
 1    years old, moved them out.  And this was like every day, every
 2    day.
 3    Q.   Was he in the unit for more than 10 days?
 4    A.   Yes, yeah.  He was in there for a couple months.  We had to
 5    put up with that for a good while.
 6    Q.   Did he indicate anything about a race war?
 7    A.   Yes.  That's what he was getting all the guns for -- all
 8    the shotguns, not guns.  He don't like guns.  He like shotguns.
 9    And he was ready for a race war, you know.  Whenever, he was
10    ready for it.  He just said, Trump saying let's make America
11    great again, and he was telling all of us, We don't need to be
12    here in America anyway, let's leave, because this is the white
13    people shit.  He just talked off the head.  I couldn't
14    understand none of that, though.
15    Q.   Just to clarify, when you said he was telling "us," he was
16    telling other African Americans?
17    A.   African Americans.  That's what he was telling us.
18    Q.   Did he say anything about police officers who are also
19    African Americans?
20    A.   Yeah.  If they was with a white officer when he wanted to
21    target them, he would get hit just as well.
22    Q.   Did you know an individual in the jail named Cowboy?
23    A.   Who?
24    Q.   Had the nickname Cowboy?
25    A.   Oh, yes.
```

1    Q.    Who is that individual?

2    A.    An old dude.  He got a lot medical problems with him, and

3    he used to come in with us.  He don't like taking showers

4    sometimes.  Yes, he would be smelling, but it was kind of rude

5    the way he tell the man, get out, you know, you stinking.  And

6    then he was calling him all kinds of cracker, you white cracker

7    and all that type of stuff, you know.

8    Q.    Any other statements to Cowboy that you can recall from

9    Mr. Calloway?

10   A.    He called him white cracker every day.  Cowboy don't pay

11   him no mind.  He just come on in anyway.  A lot of guys don't

12   pay him no mind.

13   Q.    Do you know who Meghan Markel is?

14   A.    Who?

15   Q.    Do you know who Meghan Markel is?

16   A.    Meghan Markel?  No.

17   Q.    From the royal family in England.

18   A.    Oh, yeah, her.  He was really upset about her, though.

19   Q.    So what did he say about Meghan Markel?

20   A.    Because she married the white guy and all that.  He was

21   just hoping that they turned their back on her and hope

22   something happened to her and all that, you know, yeah.

23   Q.    Sir, why did you have -- why did you want to reach out to

24   the government?

25   A.    After you told me that you couldn't promise me nothing and

1   I said it really ain't make a difference if you did or you

2   didn't, because I really just want to save someone else who

3   getting killed, you know.  I know how it feel, because the

4   victim that was deceased because of my stupidity, I feel sorry

5   for their family.

6       Also, a white person or whoever he was talking about

7   hitting, they might go to work and they don't know this is the

8   last day they're going to see him.  I'm just doing this out of

9   my heart.  If I can save somebody else, it will help me stop

10  grieving from what I've done.

11  Q.   You're talking about what happened to Ms. Early?

12  A.   Yes, yes, yeah.  If I can save another life, I'm happy

13  about that.  That's all.

14          MR. PEARLMAN:  Court's indulgence.

15          THE COURT:  Sure.

16          THE WITNESS:  My mouth is dry.

17          THE COURT:  Mark, do you have any water?

18          BY MR. PEARLMAN:

19  Q.   Did Mr. Calloway indicate what he was going to do when he

20  got out?

21  A.   Yes.  He was talking about killing white people, policemen,

22  and especially the person that set him up, the bitch that set

23  him up.

24          THE COURT:  Is that okay with the marshals?  Can he

25  have some water?  Okay.

1     BY MR. PEARLMAN:

2     Q.   Did Mr. Calloway have any newspaper clippings --

3          THE COURT:  Counsel, wait a second.  He said he needs

4     some water.

5          THE WITNESS:  Thank you.

6          THE COURT:  Sure.

7          BY MR. PEARLMAN:

8     Q.   Did he have a newspaper clipping or anything?

9     A.   Yes.

10    Q.   What was that about?

11    A.   He ran upstairs to get his newspaper clipping to prove to

12    everybody in there that he had a high-profile case.  A couple

13    people read the paper, but I didn't read it.  I don't even know

14    what it said.

15         MR. PEARLMAN:  Okay.  No further questions, Your

16    Honor.

17         THE COURT:  I just don't recall.  Was there a

18    newspaper article?  I don't recall.

19         BY MR. PEARLMAN:

20    Q.   Do you recall what newspaper it was?

21    A.   No.  I just know he had it cut out, and it had a picture of

22    him in there, but I don't know what it say in there.  Other

23    people in there read it.  He was just bragging that it was a

24    high-profile case.

25         MR. PEARLMAN:  So we wouldn't dispute that there was

1  newspaper coverage of the case.

2          THE COURT:  There was?  All right.  I just don't

3  recall.

4       Counsel?

5                    CROSS-EXAMINATION

6          BY MR. VANEGAS:

7  Q.   Good afternoon, Mr. Paris.

8  A.   Good afternoon.

9  Q.   Mr. Paris, when you entered a guilty plea in front of Judge

10  Anderson for that -- for killing Ms. Tomika Early, you indicated

11  to the Court that you wanted to accept responsibility for what

12  you had done; right?

13  A.   Yes, sir.

14  Q.   And what had happened was that when you were driving that

15  vehicle, you were high on PCP, and also, you had been drinking

16  alcohol; correct?

17  A.   Correct.

18  Q.   And later on, you learned that after striking that young

19  woman who was on the roadside -- you continued driving away;

20  correct?

21  A.   No, sir.

22  Q.   You stayed on the scene?

23  A.   Yes, sir.

24  Q.   Do you remember staying on the scene?

25  A.   No, sir.  I passed out, and my car hit the pole.

1  Q.   So after you struck Ms. Tomika Early, your car came to a

2  stop?

3  A.   Yes, sir.  I don't even really remember striking her

4  because I passed out.  I just took responsibility when I found

5  out that I was locked up for that.

6  Q.   And at first, you had an attorney by the name of Judith

7  Pipe; is that correct?

8  A.   Yes, sir.

9  Q.   And then later on, you had Mr. McCants?

10  A.   Yes, sir.

11  Q.   And Mr. McCants was an attorney who had been retained by

12  your family for you?

13  A.   Yes, sir.

14  Q.   And when Mr. McCants came to visit with you and discuss the

15  case, you were satisfied with his services; correct?  Well, let

16  me back up.

17       When he came to visit you to inform you that he was your

18  new attorney, you were fine with that; correct?

19  A.   Yes, sir.

20  Q.   And when Mr. McCants -- you negotiated a plea to resolve

21  your criminal case; correct?

22  A.   Yes, I thought we resolved it.

23  Q.   And initially, you had been charged with second-degree

24  homicide; correct?

25  A.   Yes, sir.

1   Q.   And so from second-degree homicide, Mr. McCants negotiated

2   a plea to voluntary manslaughter; correct?

3   A.   Yes, sir.

4   Q.   And then there was a range in that plea.  Was it four to

5   eight years by which the judge could -- that the government and

6   your attorney and you had agreed that that's a sentence that you

7   could receive?

8   A.   At that time I thought it was the 11(c) deal.  Come to find

9   out, it wasn't.

10   Q.   Okay.  In the discussions that you had with Mr. McCants and

11   prior to entering that guilty plea, you would agree that you had

12   to understand some complicated legal matters, for example what

13   is an Alford plea; correct?

14   A.   No, I don't get you.

15   Q.   Okay.  In the preparation of resolving your case, you

16   discussed what was the meaning of an Alford plea; correct?

17   A.   Yes.  My understanding, I thought the Alford plea was that

18   they had enough evidence, and I didn't remember what happened

19   where I couldn't testify on what, per se, happened, but he said

20   that would be an Alford plea.

21   Q.   Okay.  But you understood what that meant; right?

22   A.   Yes.

23   Q.   And then in your plea agreement, the plea agreement was

24   pursuant to an Alford plea; right?

25   A.   Yes, sir.

1    Q.   And then when you appeared -- and prior to going to court

2    and entering that guilty plea, Mr. McCants met with you at the

3    jail to discuss your plea; correct?

4    A.   Yes.

5    Q.   And you signed that plea?

6    A.   Yes.

7    Q.   And you also signed what's called a statement of facts or

8    proffer of the evidence which lays out the facts of the criminal

9    act; is that correct?

10   A.   Yes.

11   Q.   So you signed two documents?

12   A.   Yes.

13   Q.   And you signed both documents after having read them;

14   correct?

15   A.   No, I have not read them.

16   Q.   You signed those documents without reading them?

17   A.   Yes, sir.

18   Q.   So when Mr. McCants came to the D.C. jail and he presented

19   these two documents, tell me, what did you do as far as

20   receiving these documents and just signing them?

21   A.   He read the documents to me because I wasn't in no position

22   to read at that time.

23   Q.   Well, we're talking about close to three months later from

24   the time of the incident to the time of the plea; correct?

25   A.   Yes.

1   Q.   And so certainly by the time three months later, you were

2   sober again; correct?

3   A.   No.

4   Q.   You were not sober?

5   A.   No.  I was grieving, still grieving at that time.  I lost

6   my mother during that time.  I was on suicide watch at that

7   time.

8   Q.   All right.  So when Mr. McCants came to the jail and

9   presented these two documents to you, did you tell him that, in

10  fact, you were grieving, that you were on suicide watch, and

11  that you --

12  A.   Yes, he knew that, because I was still in handcuffs and all

13  that, and I was always up there crying, leaning on his shoulder

14  while I was crying.  That's why he read to me.  And when he read

15  it to me, he read 11(c) in there, and there was a guaranteed cap

16  plea.

17  Q.   And when he was -- you were crying on his shoulder, he was

18  compassionate to you; right?

19  A.   Yes, sir.

20  Q.   So now you go to court, and in front of Judge Anderson, the

21  judge asked you whether you had read the plea agreement;

22  correct?

23  A.   The judge asked me do I understand the plea.  I say yes.

24  Q.   And you said yes?

25  A.   Yes.

1      THE COURT:  Wait a minute.  His question was, did the

2  judge ask you whether you had read it?

3      THE WITNESS:  No, the judge didn't ask me did I read

4  it.

5      THE COURT:  She didn't?

6      THE WITNESS:  No.

7      BY MR. VANEGAS:

8  Q.  Did she ask you whether you had read the statement of facts

9  regarding the criminal conduct?

10  A.  No.  She just asked me do I understood what I am pleading

11  to today.

12  Q.  And when she asked you do you understood the plea

13  agreement, you said yes?

14  A.  Yes.

15  Q.  And when you were responding to that question and saying

16  yes, what did you mean by that?

17  A.  I mean by that what he read to me I understand it.

18  Q.  What he read to you was in the plea agreement; correct?

19  A.  What he read to me was 11(c), I'm pleading no more than 96

20  months.

21  Q.  At that point, at the time that you were incarcerated and

22  facing that crime, you could read the English language; correct?

23  A.  Huh?

24  Q.  You could read the English language?  You can read and

25  write?

1   A.   What, before this incident happened?  Yes, before all this

2   happened.

3   Q.   In fact, when you were young, you almost went -- did you go

4   to college?

5   A.   No, sir.

6   Q.   You were about to go to college; correct?

7   A.   Yes.

8   Q.   You were going to go to college on a scholarship to play

9   football?

10  A.   Yes.

11  Q.   But something happened; correct?

12  A.   Yes.

13  Q.   What was it that happened that kept you from going to

14  college?

15  A.   I got involved with an armed robbery, a street armed

16  robbery.

17  Q.   Okay.  And that derailed your life?

18  A.   Yes.

19  Q.   And that's 1981?

20  A.   Yes.

21  Q.   Okay.  So from 1981 fast forward to 2015, you have been

22  involved more or less in the criminal system for, what, 31

23  years?

24  A.   What do you mean "criminal system"?

25  Q.   Well, you have been getting arrested periodically?

A.   Yes, for drugs and alcohol, because I had a problem.   I had

an illness.

Q.   All right.   But going back to the question regarding your

ability to read and write the English language, you could do

that?

A.   Yes.

Q.   And so those documents that were presented to you, on your

own you decided not to read them?

A.   No, I was crying, I was crying every time he come up there.

He even admitted that I was crying a lot.   He said I was in deep

depression.   That's what he diagnosed me.

Q.   When you went to court, were you crying when you were in

front of Judge Anderson?

A.   Yes; yes.

Q.   In fact, you were crying because you wanted to take the

next step forward and move on with your life; correct?

A.   No.   I was crying because I saw how hurt the family was.

Q.   Were they present in the courtroom?

A.   Yes.

Q.   And in fact, either at that point or on a separate

occasion, you told the family that "I wish I could trade

places"; correct?

A.   Yes.   I wish it was me that died than her.   I still wish

that right now.

Q.   But when you got a prison sentence of 10 years, you didn't

1  think that that was fair to you; correct?

2  A.   No.   What I think wasn't fair, that Mr. McCants misled me

3  the wrong direction.   That's what I thought.   That's why I filed

4  the appeal.

5  Q.   When you were in court and Judge Anderson was asking you

6  questions, she read or spoke to you and said, I understand that

7  the range is four to eight months, but me, the judge --

8            THE COURT:   Four to eight what?

9            MR. VANEGAS:   Excuse me.   Four to eight years.   I

10 apologize, Your Honor.

11           BY MR. VANEGAS:

12 Q.   When Judge Anderson indicated that the range was four to

13 eight years, she was speaking directly to you, and you

14 understood that that was the range; correct?

15 A.   Yes.

16 Q.   And Judge Anderson did not say to you this range is an

17 11(c)(1)(C) plea; correct?

18 A.   No, she didn't.

19 Q.   And in fact, what she said is that she was not bound by

20 that range; correct?

21 A.   Yes, she said that.

22 Q.   And she told you that she could give you more time than

23 eight years; correct?

24 A.   Yes.

25 Q.   So at that time when she said to you that she could give

```
1    you more than eight years, you understood that that no longer

2    was an 11(c)(1)(C) plea; correct?

3    A.   Yes, I understood, and then I didn't understood, because

4    when I got what I got, I filed against Judge Anderson because I

5    thought she was wrong until she responded back and said it

6    wasn't her wrong.  That's when I wanted to see the plea

7    agreement, and I wrote Kevin McCants and asked him send me the

8    plea agreement so I can read it.

9    Q.   After receiving the 10 years, at some point you start

10   filing pro se motions; correct?

11   A.   Yes.

12   Q.   And the first pro se motion was against Judge Jennifer

13   Anderson; right?

14   A.   Yes.

15   Q.   And you felt that Judge Jennifer Anderson had treated you

16   unfairly; correct?

17   A.   No.  I thought she went above the 11(c), what I thought was

18   the cap.  Come to find out, it wasn't a cap.

19   Q.   When you filed your motion, you filed a motion for Judge

20   Anderson to recuse herself from your case; correct?

21   A.   No.

22   Q.   Well, what was the motion that you filed against or in

23   reference to Judge Anderson?

24   A.   About she -- I thought she didn't understand 11(c).  I

25   really still thought I had the 11(c).  I didn't really find out
```

that I was the one wrong until I came back on Number 23-110 when

I had gotten Ms. April Downs, and she's the one that gave me all

my paperwork, and I read it.  I kept going over and over it, and

I never saw 11(c) on there.

Q.   Very well.  But did you file a pro se motion in which you

requested for Judge Anderson to recuse herself?

A.   No, I don't know if it's recuse.  I was filing that she

went above the 11(c) deal, which I was wrong, though.  I admit

that I was wrong what I filed against her, because she was

right.

Q.   Very well.  And so then she actually appointed a lawyer for

you; correct?

A.   Yes, Ms. April Downs.

Q.   Ms. April Downs.  And then as a result of that, what ended

up happening is that there was a 23-110 hearing in which you

alleged that Mr. McCants provided ineffective assistance of

counsel; correct?

A.   Yes.

Q.   And there was a hearing on that?

A.   Yes.

Q.   And during that hearing, you were questioned in reference

to your plea agreement and your statement of offense; correct?

A.   Yes.

Q.   And during that hearing, you again indicated that, in fact,

you had not read those documents; right?

1  A.   What documents?

2  Q.   The plea agreement, that you had not read it.

3  A.   Not at the time before I came back.  When I came back, I

4  read it.  That was my first time.

5  Q.   Then you finally did read the agreement?

6  A.   Yes.

7  Q.   Okay.  And after you read the agreement and you saw that,

8  in fact, there was no 11(c)(1)(C) plea and that you had signed

9  that agreement, you understood that the agreement that you

10 signed, that the judge could give you more than eight years;

11 right?

12 A.   Yes, I understood that then.

13 Q.   You understood it then.  And so in fact, the agreement was

14 always that you could receive more than eight years; correct?

15 A.   Correct.

16 Q.   And so what Mr. McCants had brought you to the jail was the

17 correct and true agreement; correct?

18 A.   No, I don't know, because I didn't read it.  I don't know

19 what he brought.  He might have brought that, but when he read

20 it to me, I hear 11(c) up in here when he read that.  I wouldn't

21 have never filed it if I didn't hear that.

22 Q.   11(c)(1)(C) -- withdrawn.

23      You just indicated that all you heard in that discussion

24 about a plea agreement was 11(c)(1)(C).  That's all that you

25 took away from that discussion regarding the plea?

A.   Yes, I took that, and also I took that Kevin McCants said

the worst that can happen during the sentence is you get the

whole eight years.  He said, I don't think you're going to get

the whole eight years, I think you're going to get five and

three years' probation, that equals up to eight.  That's what he

kept telling me.  And he said, You wouldn't be mad if you get

the whole eight, will you?  And I said, No, I would not be mad.

Q.   In the hearing in which you had April Downs as your

attorney, Mr. McCants was a witness, just the way you're a

witness now; correct?

A.   Yes, sir.

Q.   And Ms. Downs cross-examined him on your behalf; correct?

A.   Yes, sir.

Q.   And then you also took the witness stand?

A.   Yes, sir.

Q.   And later on, you learned that, in fact, Judge Anderson

reached a conclusion whether she found you credible or not;

correct?

A.   Yes.

Q.   And you learned that she found you not credible; correct?

A.   Yes.

Q.   And you also learned that she found Mr. McCants credible;

correct?

A.   Yes.

Q.   Later on -- and the purpose of this whole 23-110 is because

1    you wanted the sentence to be reduced; correct?

2    A.   I wanted the 96 months.  That's what I plead to.

3    Q.   That's what you pled to?

4    A.   Yes.

5    Q.   You pled to that because Mr. McCants told you that?

6    A.   Yes, he said it.

7    Q.   But you agree that Judge Anderson did not tell you that?

8    A.   No, Judge Anderson never told me that.

9    Q.   And when you were in court for that plea hearing, Judge

10   Anderson asked you whether you've taken any drugs, medication

11   that would impair your ability to understand what's going on

12   right now in that plea hearing; correct?

13   A.   Yes.

14   Q.   And you told her that, in fact, you had not taken any

15   drugs; right?

16   A.   No, I say, I can understand, no, I haven't taken any drugs.

17   Q.   Had you taken prescription medications?

18   A.   Yeah, I take prescriptions.

19   Q.   Was that prescription medication for your depression?

20   A.   Yes.

21   Q.   And have you taken prescription medication for -- relating

22   to being suicidal?

23   A.   I take high blood pressure, acid reflux, diabetes, and

24   Prozac and Elavil.

25   Q.   And none of that medication impaired your ability to

1    understand what Judge Anderson was saying to you right then and

2    there; correct?

3    A.    No.

4    Q.    After Judge Anderson denied your claims of ineffective

5    against Mr. McCants, you fired Ms. April Downs; correct?

6    A.    No, I didn't fire her.

7    Q.    Did you get rid of her?

8    A.    No.  She automatically leave off the case because her case

9    was over with for the 23-110.

10   Q.    All right.  So that was it?

11   A.    Yes, and I went to the next step, and that's how I got

12   Mr. Terry Eaton.

13   Q.    And the next step, again, was because you wanted, what, 96

14   months?

15   A.    Yes.

16   Q.    Okay.  And having seen -- having been through a 23-1

17   hearing, having seen the plea documents, you still felt that you

18   had been wronged?

19   A.    Yes, because during the hearing, Kevin McCants admitted

20   that he did tell me that I had 11(c) deal.

21   Q.    But Judge Anderson did not credit what you are saying;

22   correct?

23   A.    She favored Kevin McCants.

24   Q.    Okay.  Going back to Mr. Calloway, you met Mr. Calloway

25   when he was at the --

1          THE COURT:  I'm sorry.  You said during the hearing

2     Mr. McCants admitted that he did tell you that you had an 11(c)

3     deal?

4          THE WITNESS:  Yes.  He said it several times.

5          THE COURT:  He said that in court?

6          THE WITNESS:  Yes.

7          BY MR. VANEGAS:

8     Q.   When you met Mr. Calloway, you had been brought back to the

9     D.C. area because --

10         THE COURT:  Did he ever explain why he told you that

11    you had a (C) plea when that wasn't a part of the written

12    agreement?

13         THE WITNESS:  No, he didn't explain that.  He just

14    kept saying --

15         THE COURT:  Did the judge ask him?

16         THE WITNESS:  No, she didn't ask him that.

17         THE COURT:  That just needs some clarification.  Did

18    he testify that he told him a (C) plea?

19         MR. CHAWLA:  He said twice -- my recollection of the

20    transcript is, he said twice (C) plea on the record and then

21    corrected himself and said oh, no, no, no, it wasn't a (C).  But

22    he said twice on the record that it was and then said, no, no,

23    no, it wasn't.  I will find it for the Court.

24         THE COURT:  Did the judge ever ask him why he told his

25    client it was a (C) plea?

1          MR. EATON:  Your Honor, because that was the subject

2     of my appeal, I can proffer that Mr. McCants explained that at

3     the time he had had so many cases, and he just couldn't remember

4     whether this particular one -- he thought that he was referring

5     to another case.  But there were at least two occasions where he

6     said "(C) plea," and then he corrected himself.

7          THE COURT:  All right.  Thank you, Mr. Eaton.

8          MR. VANEGAS:  May I continue, Your Honor?

9          THE COURT:  Yes.  I'm sorry to interrupt you.

10         MR. VANEGAS:  No, it's okay, Your Honor.

11         BY MR. VANEGAS:

12    Q.   Mr. Paris, when you met -- when you were brought back to

13    the D.C. jail around the time that you met Mr. Calloway, what

14    was the reason that you were brought back?

15    A.   Back on the 23-110.

16    Q.   And so around the time that -- and how long had you

17    initially been at the D.C. jail before issues regarding heat

18    came up?

19         THE COURT:  I'm sorry.  I dont want to overlook the

20    court reporter.  Are you okay?  Do you need to take a recess?

21         THE COURT REPORTER:  No, I am fine.  Thank you.

22         BY MR. VANEGAS:

23    Q.   How long had you been at the D.C. jail before you were

24    moved from the D.C. jail to the CTF because of the heat issues?

25    A.   I come back in 2016.  We moved over to CTF in 2017.

1   Q.   So would it be fair to say you had been back in D.C. for

2   about six months before going from the D.C. jail to the CTF?

3   A.   Yeah, something like that.  I'm not sure.  It's around

4   about that time.

5   Q.   And during that initial six months, is that when you were

6   going back to court to litigate the 23-110?

7   A.   Yes, sir.

8   Q.   By the time that you went back to the CT -- by the time

9   that you went to the CTF, had your 23-110 hearing been resolved?

10  Had it finished?

11  A.   No, no, sir.

12  Q.   It was still going on?

13  A.   Yes.

14  Q.   So when you go to the CTF on kind of the heat issues, the

15  23-110 hearing is still going on?

16  A.   Yes.

17  Q.   But you're not coming to court every day; correct?

18  A.   No, no, we wasn't coming every day.

19  Q.   And although there were serious heat issues at the D.C.

20  jail, there was only a select few who were moved from the D.C.

21  jail to the CTF; correct?

22  A.   No, the whole unit moved.

23  Q.   And by "the whole unit," that would be about how many

24  individuals?

25  A.   You had top tier and bottom tier on both sides.  That's a

1    lot.  Like 80-some people, I guess.

2    Q.   And that's because that block was affected by the heat

3    issues?

4    A.   Yes.

5    Q.   And so you and the other -- the majority of the other

6    individuals who were in that block, were they also 50 and over?

7    A.   Yes.  Everybody was 50 and over.

8    Q.   So that whole block that was 50 and over was moved to the

9    CTF?

10   A.   Yes.

11   Q.   All right.  But by and large, everyone else who was not

12   affected by that remained at the D.C. jail, correct, the other

13   prisoners?

14   A.   Oh, other units in different places?

15   Q.   Yes.

16   A.   I don't even know.  It was basically older people who

17   couldn't take the heat, and some of the guys passed away, died

18   because of the heat.

19   Q.   So you go to the CTF, and that's when you first see

20   Mr. Calloway?

21   A.   Not when I first went to CTF.  I had been over there.  I

22   was over there since '17.  I saw him when he got there in, what,

23   2018.

24   Q.   So you were in there, and then Mr. Calloway shows up?

25   A.   Yes, him and a lot of other guys under age there moved over

1    there.

2    Q.    And you would agree that -- you had been at the D.C. jail

3    on many occasions, correct, in your history of being charged

4    with -- being charged in D.C.?

5    A.    I've been over there twice.

6    Q.    And the first time was when?  Do you recall?

7    A.    I'm not sure.  I think it was '90 something.

8    Q.    In the '90s?

9    A.    Yeah, I think so.

10   Q.    And you're familiar with the fact that people like going to

11   the CTF; correct?

12   A.    People like to go there?

13   Q.    Yeah, prisoners.  If prisoners have a choice between the

14   D.C. jail and the CTF, they prefer the CTF; correct?

15   A.    No, not really.  A lot of people didn't even want to move

16   over there.  They asked to be moved to other blocks.  A lot of

17   people didn't want to move over there.

18   Q.    At the CTF, one thing that you have is contact visits;

19   correct?

20   A.    Yes.

21   Q.    And you don't have contact visits at the D.C. jail?

22   A.    Yes.

23   Q.    So you meet -- you see Mr. Calloway, and Mr. Calloway does

24   not come and introduce himself to you; correct?

25   A.    No.

1   Q.   Okay.  He's just another prisoner who is now at the CTF;

2   right?

3   A.   Yeah.

4   Q.   The one thing that you do know about Mr. Calloway is that

5   he had a detail, right, meaning he had work in the CTF?  He was

6   working in the kitchen?

7   A.   Yes.

8   Q.   And he was working there every day?

9   A.   I don't know about every day.  He worked in the kitchen on

10  the morning shift.

11  Q.   So you saw -- you made those observations that he was

12  working in the kitchen?

13  A.   Yeah, he was working in the kitchen.

14  Q.   Okay.  And you would agree that in order to get work at the

15  CTF to work in the kitchen, you have to be approved by the

16  guards; correct?

17  A.   I guess.  I worked in the kitchen also.

18  Q.   Okay.  So when you worked in the kitchen, not everyone can

19  have the privilege of working in the kitchen; right?

20  A.   You've got to go to medical and get medical cleared.

21  Q.   But you also had to be free of disciplinary problems;

22  correct?

23  A.   Yes.

24  Q.   You cannot be in the hole, in segregation, and have a

25  detail?

1  A.   No, you have to be in regular population to work in the

2  kitchen.

3  Q.   And you saw Mr. Calloway in general population; right?

4  A.   Yes.

5  Q.   And during the time that you saw Mr. Calloway, you never

6  saw him segregated, did you?

7  A.   Segregated?

8  Q.   Well, in the hole.

9  A.   No, they don't have no segregation over there, not where we

10  was at, C2B.

11  Q.   Well, you're clear that in the CTF, they don't have what is

12  commonly known as the hole, but they have the SMU, the

13  segregation unit?

14  A.   Yeah, they have that somewhere in CTF, but it's not over

15  there where we was at.

16  Q.   Okay.  But they do have it?

17  A.   Yes.

18  Q.   And as far as you know, Mr. Calloway was never classified

19  in -- for segregation; correct?

20  A.   No.  I just know he was in our unit.  I don't know if he

21  ever been locked up before.  I don't know none of that.

22  Q.   And so you meet Mr. Calloway, and what you see is that he

23  likes watching the news; correct?

24  A.   Yes.  That's what we all watch, the news, when we come off

25  lockdown at 5:00.

Q.   And when inmates or prisoners are watching the news, about how many people are watching the news?

A.   There's a lot of people in the day area, and there would be about nine in the TV room we would be at.

Q.   So given your personal observations of watching TV -- were you watching TV daily?

A.   Yes.

Q.   And based on that experience of watching TV daily, about how many people would you estimate were watching TV at the same time that you were watching TV?

A.   Are you talking about the TV room?  About nine people.

Q.   Nine people?

A.   Yes.

Q.   And when the news would come on, there would always be about nine people?

A.   Yes.

Q.   Including Mr. Calloway?

A.   Yes.

Q.   And you have a recollection that when there were programs about police brutality, that he would get animated; correct?

A.   Yes.

Q.   And you indicated that he would watch these programs about police brutality -- was he watching -- I will start again.

On a daily basis, do you recall segments in the news about police brutality?

A.   Yes.

Q.   Every day?

A.   Not every day, but it was on there quite a few -- a lot of times, it was on there.

Q.   And when these segments were being played on TV, there were always about nine prisoners watching; right?

A.   Hmm?

Q.   When these segments on police brutality were being played, there was always approximately nine prisoners watching?

A.   Nine, no.  There might have been a lot of people on the outside watching, too, because they watch the news out there in the day room, too.

Q.   So many people were watching the news?

A.   That's all the people that will be watching.  After the world news goes off, it's just free TV after that.

Q.   And the world news, that was either at 6:30 --

A.   6:30 to 7, 7:00.

Q.   And on the world news -- do you recall that it was on the world news that there were segments of police brutality, or was it on the local news?

A.   It would be on the local news and mostly on the world news because it would be wide world, you know.

Q.   And you reference that there was one incident -- well, there were two.  There was something about New York City, and then there was one about Baltimore; correct?

A.   Yes.  It was more than that, too.  It was more than just that, too, though.

Q.   Since there were more than that, the other incidents that you recall, that you reference in your direct, where did those other incidents take place?

A.   There was a couple more in New York, and I forget what state the other one.  The man that ran down the street, I don't know if he had a machete or whatever he had, and he was running, and the police shot him.  It was a lot of different incidents.  Like one guy jumped out the car, ran, and then he wind up running in his grandmother backyard and hid by the shed and got shot.  It was a lot.  It was a lot of shooting, you know.

Q.   At what point did you decide that you thought it was important to contact your attorney about Mr. Calloway?

A.   When he kept talking about just killing innocent people, you know, and just mainly white and policemen, officers, innocent people that don't even know they're getting ready to get killed, you know.

I just said I'm going to call my lawyer and tell him, and then when the guy from the government told me they couldn't promise me nothing, I told them off the break, I really don't even care.  My thing is that I want to try to save somebody else.  I don't have that much longer anyway.  I'll be finished with my time anyway.  I'm just doing it trying to save another person.  They say if you hear something or see something, do

1    something about it, and that's basically what I'm doing.

2    Q.   So as a result of you hearing something, someone saying

3    something, you decided to reach out to your lawyer?

4    A.   Yes.

5    Q.   And when you reached out -- and at this point your lawyer

6    was Mr. Eaton, who is sitting right there?

7    A.   Yes.

8    Q.   And you call or somehow communicate with Mr. Eaton and say

9    well, there's this guy Clark Calloway and he's making all this

10   noise; right?

11   A.   Yes.

12   Q.   Did you ever have a discussion with other inmates so that

13   those other inmates, meaning if nine inmates are watching the

14   TV, there's you, Mr. Calloway, so maybe another five, maybe up

15   to seven other inmates, did you turn to those other seven

16   inmates and say, you know, We need to do something about Clark

17   Calloway, why don't you call your attorney and report him?  Did

18   you do that?

19   A.   No.  I had my reason not doing that.

20   Q.   But you were trying to save lives, though; right?

21   A.   Yeah, I'm trying to save lives, but I'm also not trying to

22   tell no inmate what I'm about to do.  That would be a target on

23   my head.

24   Q.   When you decided -- when you saw that Mr. Calloway was

25   making statements against a white inmate, did you go over to the

white inmate to see if he was doing okay?

A.    Yeah, I always told Cowboy, Don't even worry about him, man.

Q.    And Cowboy wasn't worried about him, was he?

A.    No, he really wasn't.

Q.    Because he didn't care about what Mr. Calloway was saying?

A.    No, Cowboy, he's just a guy that -- a lot of people say disrespect stuff to him.  He's used to it to where it don't bother him.

Q.    And what Mr. Calloway was saying was similar to what other people have been saying?  It didn't bother him; correct?

A.    No, other people -- Mr. Clark, he say a lot of racist stuff.  Other people wouldn't say racist stuff.  Other people would just tell Cowboy -- Cowboy's like passing gas around people and all that, and they will tell him stuff like that.  People will give him coffee to get in the shower.  They will give him stuff, and he'll jump in the shower.  They wasn't calling him cracker and all that type of stuff, why don't you die and all that stuff.

Q.    Did you ever see a guard intervene because Mr. Calloway was threatening Cowboy?

A.    No, no, because we be in a closed room with the door shut.

Q.    So you never saw that; correct?

A.    There ain't no police be in there where we be at.

Q.    And during the time that you saw Mr. Calloway interact with

1   Cowboy, you never saw him threaten Cowboy, did you?

2   A.   No.  He just called him names.  He don't threaten.  He just

3   call him -- Cowboy real sick.  He had a lot of surgeries.  He be

4   like, Why don't you curl over and die, stuff like that.

5   Q.   You never saw Mr. Calloway physically go over and assault

6   him, did you?

7   A.   No; no.

8   Q.   In fact, you never saw Mr. Calloway assault anyone; right?

9   A.   No.

10  Q.   And it would be fair to say that in the times that you've

11  been at the D.C. jail and the CTF, that you've seen inmates

12  assault one another; correct?

13  A.   Yeah, they fight over all kinds of stuff, playing cards

14  together, you know, bond stuff, don't pay it back.  It be all

15  different kinds of stuff.

16  Q.   You also see inmates attack guards; correct?

17  A.   No.

18  Q.   You have never seen that?

19  A.   No.

20  Q.   You've been incarcerated in D.C. and Virginia and Maryland;

21  right?

22  A.   Yes.

23  Q.   You know penal facilities in all three states; right?

24  A.   Yes.

25  Q.   And so you've seen when an inmate puts their words into

1    action and actually assaults someone; correct?

2    A.   Say it again.

3    Q.   Well, you have seen -- you've seen occasions where an

4    inmate will make a threat and follow up on that threat and

5    assault someone; correct?

6    A.   Yes, another inmate assaulted another inmate, yeah.

7    Q.   You never saw Mr. Calloway do that; right?

8    A.   No.

9    Q.   So although Mr. Calloway was making statements, you never

10   saw him attack either a white guard or a white inmate; correct?

11   A.   No, I just hear what he say out of his mouth.  That's all.

12   Q.   Did you know -- other than the fact that he was in jail for

13   a firearm, did you know his criminal history?

14   A.   No, I don't even know.  I don't know.

15   Q.   So you don't know whether he was just making things up and

16   just talking?

17   A.   I don't even know if he was making it up or not.  I just

18   know he ran and got his newspaper, and people in there were

19   reading it, and they verified that yeah, he do have a machine

20   gun.

21   Q.   So even though you didn't know whether, in fact, he was

22   just saying things and making things up, you still decided that

23   you needed to talk to your attorney because you thought he was

24   going to kill people?

25   A.   Yes, and let them take it from there, and they will find

1    out whether what I'm telling them is a lie or whatever.

2    Q.   When you met with the agents, did you tell these agents

3    that Mr. Calloway was making threats against officers or white

4    people on a daily basis?

5    A.   Yes.

6    Q.   And the threats was always around the TV area?

7    A.   Yeah, that's where I am every day.

8    Q.   And did you tell those agents who those other people were

9    so that they could -- the agents could confirm the fact that

10   what you're saying is actually true?

11   A.   Yes, I told them Cowboy and one of his Muslim friends.  All

12   the other dudes, I don't really know them.  I just know Cowboy's

13   his nickname.

14   Q.   But you told them about Cowboy?

15   A.   Yeah.  I just stay to myself.  Whoever come in there, I

16   just, you know -- we got respect for each other.  We respect

17   each other.  That's all.

18           MR. VANEGAS:  Brief indulgence, Your Honor.

19           THE COURT:  Sure.

20           BY MR. VANEGAS:

21   Q.   You indicated that Mr. Calloway talked about being -- that

22   he wanted to ambush, is it, police officers?

23   A.   Yes.

24   Q.   And did he elaborate like how he was going to ambush police

25   officers?

A.   Yes.  He was talking about he had been in the Marines.
They trained him how to ambush with -- he was describing how he
could do this and do that.  Especially when we see an ambush on
TV, he would say, I could do it better than that, you know.

Q.   And at one point, I think you told the agents that he said
something about having -- knowing how to be in the woods?

A.   Yes.

Q.   And did he elaborate as to how being in the woods, he would
be able to ambush people?

A.   Yeah, he could blend in with the trees.  Like a person
walking past, they would never knew he was right there.  They
would think that was just a bush.

Q.   So somewhere in the forest of D.C. or Maryland and
Virginia, he was going to wait by trees and ambush?

A.   I don't know where.  Only he know where.  I don't know
where.

Q.   But he didn't elaborate where?

A.   No.  He just talking about his technique, what he can do
and all that, you know.  I don't even be asking him all that.

Q.   In the discussion with the government attorneys who are
here, the issue of Rule 35 came up, correct, a motion to reduce
your sentence under Rule 35; right?

A.   Yes.

Q.   And you know what a Rule 35 is; right?

A.   Yes.

1  Q.   And it's a way by which you can have your sentence reduced;

2  right?

3  A.   It's not guaranteed.

4  Q.   Well, that wasn't the question.  It's a way by which you

5  can have your sentence reduced; right?

6  A.   Yes.

7  Q.   And in order to have your sentence reduced, you have to

8  come here and testify against Mr. Calloway; right?

9  A.   Yes.

10  Q.   And you were prepared for this hearing by these two

11  prosecutors; correct?

12  A.   What do you mean by "prepared"?

13  Q.   Well, they told you about that there was going to be a

14  hearing and that they would ask you questions about

15  Mr. Calloway; right?

16  A.   Yes.

17  Q.   And you were told that if you were to get a Rule 35, that

18  is, a reduction in your sentence, you were going to have to

19  testify against Mr. Calloway; correct?

20  A.   Yes.  I was also told they can't guarantee me none of that.

21  That's all they can do, is leave it up to that.  Everything

22  would be up to the judge.

23  Q.   It was like that same guarantee that Judge Anderson said to

24  you back when she -- you entered a plea; right?

25  A.   I am prepared for her to say the same thing again.  That's

1   why I say, I'm really looking out for someone, an innocent

2   person getting killed.  That's all I'm worrying about.  And I

3   will be prepared for it to not -- to be denied on 35.

4   Q.   Going to the issue of innocent person being killed, this is

5   because you started thinking about because you actually had

6   killed someone?

7   A.   No.  Number 1, my mother passed, my aunt passed, two of my

8   brother passed.  I've been holding grief.  And that's how I got

9   on drugs and drink, fighting the grief, instead of getting

10  professional help.  And I look at the case that -- the victim in

11  my case family, how they go through grief and how they was in

12  the courtroom crying.  I don't want to see innocent people and

13  kids and something that got a father and mother going to work

14  and get killed.  That's all.  That was really hitting my heart

15  right there.  If I could save a person, that will help me out

16  more than anything.

17  Q.   Well, in 1981 when you were convicted for robbery, that was

18  Count 1.

19  A.   Yes.

20  Q.   And then also, were you also convicted with assault with a

21  deadly weapon and rape and robbery?

22  A.   No.  She already done a presentence investigation and took

23  that off.  That's something -- I've never been charged with

24  nothing like that.

25  Q.   You've never been charged --

1    A.    No.  Look at the date on that, I was still incarcerated at

2    that date, what you see on there.

3    Q.    What it says is that it merged with the other crime.

4    A.    No, it can't merge with it.  I had a street robbery against

5    a student, that I was a student in high school, he was a

6    student.  It wasn't nothing sexually.  I don't even know where

7    all that got -- took place at.

8    Q.    Well, when the presentence investigation report was being

9    prepared, did the probation officer ask you about that?

10   A.    No; no.

11           MR. PEARLMAN:  Your Honor, at this point we would

12   object.  This doesn't seem to be for credibility.  It's getting

13   into the meat of a charge that's in the PSR.  He said it's

14   incorrect.  It seems to be offered for the proposition that he

15   can't have a legitimate motive to now testify and seems too far

16   afield.

17           THE COURT:  I will give counsel some leeway.  This

18   matter is nonjury.  I can separate the fact from fiction.  So I

19   will give counsel some leeway here.

20       Is it clear that it was an uncharged offense, Mr. Vanegas?

21           MR. VANEGAS:  The way I read it is that it merged --

22   it's listed as being merged with another crime.

23           THE COURT:  What are you looking at?  A presentence

24   report?

25           MR. VANEGAS:  Yes, Your Honor, a presentence report.

```
 1                THE COURT:  It seems like judgment and conviction
 2       would be the best evidence.
 3                MR. VANEGAS:  You're right, Your Honor.  I will move
 4       on.
 5                THE WITNESS:  Your Honor, could I say something real
 6       quick?  I testified for my own PSR report.  Number 1, if you
 7       look at it, it got two Social Security numbers.  Then it got
 8       another guy called Robert L. Paris.  There was a lot of crimes
 9       in there that's not mine.  Judge Anderson ruled that they go do
10       another one.  I don't know if he got the new one that she done.
11       There was a new one they had to do all over, and none of that
12       wasn't on there.
13                THE COURT:  A new presentence report?
14                THE WITNESS:  Yes, sir.
15                MR. VANEGAS:  I will move on, Your Honor.
16                THE COURT:  Is there another one?
17                MR. VANEGAS:  Your Honor, may I have a brief
18       indulgence to consult with Mr. Calloway?
19                THE COURT:  Sure.
20                MR. VANEGAS:  Thank you.
21           (Defense counsel conferred with defendant.)
22                MR. VANEGAS:  Thank you, Your Honor.
23                THE COURT:  Sure.
24                BY MR. VANEGAS:
25       Q.   Mr. Paris, do you recall the time frame of how long you
```

1   were housed at the CTF with Mr. Calloway?

2   A.   How long?

3   Q.   Yes.

4   A.   It was a couple months.  I don't know how long it was.  Per

5   se time limit, I ain't got.

6   Q.   So it was about two months?

7   A.   It might have been a little bit longer than that.

8   Q.   Okay.  So it certainly was not like for six months?

9   A.   It could have been.  I'm not sure about the time frame of

10  that.  I just know he was over there, and on one particular day,

11  the counselor said all the people that's under 50 they getting

12  out of there, because there was a lot of stuff going on, how

13  they was taking advantage of old guys, the young guys that was

14  in there.

15  Q.   People taking advantage of the old guys?

16  A.   Yeah, stealing from them, picking fights, you know, a lot

17  of people 50 and over over there.

18  Q.   Mr. Calloway did not engage in that?

19  A.   No, he didn't engage in that.

20  Q.   And did you have personal interactions with Mr. Calloway?

21  A.   No.

22  Q.   So you would just kind of hear him say things, but you

23  never actually talked to him about the things that he was

24  saying?

25  A.   I would say, could we listen to the TV?  He would stand up,

1    and he just took control and just say what he want to say.  We

2    couldn't hear the TV most of the time.

3    Q.   You couldn't hear the news?

4    A.   No.

5    Q.   Even after -- so typically, a segment on an issue lasts for

6    maybe two or three minutes; correct?

7    A.   A segment, we would hear it, but we would never finish

8    hearing the whole complete what happened and this and that.

9    Q.   So after the segment would be over in two or three minutes,

10   are you saying that he continued to yell and --

11   A.   Yeah, he would say his opinion and go on and on and on and

12   on.

13   Q.   But you would agree that he also is someone who doesn't

14   modulate his voice?  He actually talks loud all the time?

15   A.   He like talking.  He like talking, yeah.

16   Q.   But having listened to him and being in proximity to him,

17   you would agree that he's someone who talks loudly?

18   A.   No.  He's only talked loudly when he want to be heard, you

19   know.  Like if you want to be heard and you just talk over

20   everybody and talk over the TV, he just wanted to be heard and

21   make sure he be heard.

22   Q.   And even though this was happening, guards didn't come in

23   and intervene and tell him to stop talking?

24   A.   No, there ain't nobody go tell the police that, no.

25   Q.   What I'm asking is, guards wouldn't come in and tell him to

1  shut up?

2  A.   No, they don't know what he be in there doing because the

3  door was shut.  None of us never go tell the officers none of

4  that.

5  Q.   And the other inmates, the Muslims, they listened to him,

6  but they didn't really care what he was saying; correct?

7  A.   They was telling him all the time to be quiet, but he don't

8  listen to none of them.

9  Q.   You don't like Mr. Calloway, do you?

10 A.   I ain't got nothing against him.

11 Q.   You don't?

12 A.   No.

13 Q.   But you said all these things about that he on a daily

14 basis was making threats against other people; correct?

15 A.   About policemen and white people.

16 Q.   And it's clear that based on what you've told us, that at

17 least seven or six or five other people were always listening to

18 these threats; correct?

19 A.   Yeah.

20 Q.   Now, you don't know anything about his case?

21 A.   No.

22 Q.   So what you do know is the noise that he was making as far

23 as the statements that you described; correct?

24 A.   Yeah, what he said, so far about what he said about

25 somebody set him up, The bitch set me up.

1   Q.   And you don't know the circumstances of how he got the

2   firearm; correct?

3   A.   No.

4   Q.   You don't know anything about that?

5   A.   No.

6   Q.   And do you know, after this hearing, what's the next step

7   as far as whether you get a Rule 35 motion?

8   A.   I don't know.

9   Q.   But that's in the works; correct?

10  A.   Yeah, I assume.

11  Q.   Well, that's what you're here for; right?

12  A.   I'm here to save people from getting injured or hurt or

13  killed.  I'm here for that, too.

14             MR. VANEGAS:  Your Honor, I have no further questions.

15             THE COURT:  When is your sentence up?

16             THE WITNESS:  2023.

17             THE COURT:  Redirect?

18             MR. PEARLMAN:  Only about five minutes, Your Honor.

19                        REDIRECT EXAMINATION

20             BY MR. PEARLMAN:

21  Q.   Sir, were you indicating that you would not tell the guards

22  about Mr. Calloway being loud in the TV room?

23  A.   No.

24  Q.   Why not?

25  A.   Because I wouldn't do that.  You don't do that when you're

1   locked up.

2   Q.   So that's a part of the code, that you don't tell the

3   guards --

4   A.   You don't know that the police are going to deal with the

5   situation and correct it or whether the police go back and tell

6   him, Oh, you know the guy came and told me you're doing this and

7   doing that, you know.

8        I ain't been in no trouble since I've been in, and I'm not

9   trying to fight nobody.  I just stay in there and just shake my

10  head and let it be.  It just came to be a routine thing.

11  Q.   And Mr. Vanegas asked you earlier about why you didn't tell

12  other inmates to contact their attorneys about the things that

13  Mr. Calloway said, and you responded, That would be a target on

14  my head.

15  A.   Yeah.

16  Q.   What did you mean by that?

17  A.   The same way I was asked did I want to go in protective

18  custody and I said no.  Because when you go in protective

19  custody, it's a target.  Everybody in the jail know you went on

20  protective custody.  That will be a target on your head.

21       MR. PEARLMAN:  Your Honor, I just want to supplement

22  the record with a few pages of Mr. McCants's testimony before

23  Judge Anderson, but I don't think I need the witness to do that.

24       THE COURT:  All right.

25       Let me ask you a question.  When did you have this

discussion about protective custody?

THE WITNESS:  When I first brought it to my lawyer and them, and they asked me.

THE COURT:  So you're in general population?  Are you at D.C. jail?

THE WITNESS:  No; no.

THE COURT:  You're in general population wherever you are -- but you don't have to tell us where you are -- is that right?

THE WITNESS:  Yeah.

THE COURT:  Why should the Court -- listen very carefully to the question before you answer.  Why should the Court believe you?

THE WITNESS:  Believe me?

THE COURT:  Yeah.

THE WITNESS:  Because I don't have no reason to just come here and fabricate nothing.

THE COURT:  But you're trying to get Rule 35.

THE WITNESS:  Like I already said, I told the government, it don't really make me no different.  I already got all my time in.  Two more years, I will be in the halfway house either way.  Ain't nothing really I get out of it.  I ain't really getting nothing out of it.  If anything, I get out of it that I can get out and see a doctor because I was diagnosed with cancer.  Maybe I can go ahead and get this thing removed out of

1    me before it start spreading.  But anything else besides that,

2    you know, I can go ahead and tough it out and finish my time.

3        I just didn't want to one day -- I look at the news all the

4    time.  I didn't want to look at the news and I see his picture

5    there and saw what he had done and then I say crap, why didn't I

6    tell nobody, I already knew it and why didn't I tell nobody.

7    That was something that would be on my shoulder that I wouldn't

8    be able to sleep on, you know, because I got to deal with enough

9    already that's on my shoulder.

10            THE COURT:  So let's go back in time a little bit.  So

11    you approached the government?

12            THE WITNESS:  Yes.

13            THE COURT:  All right.  What prompted you to approach

14    the government?

15            THE WITNESS:  Huh?

16            THE COURT:  What motivated you to approach the

17    government?

18            THE WITNESS:  Because I knew I was on my way to go

19    back to the feds, and I said let me let my lawyer know before I

20    leave that I know something.  And I said, you know, I'm going to

21    go ahead --

22            THE COURT:  How much time had passed between -- how

23    much time had passed from when you heard what Mr. Calloway was

24    saying to the time when you told your attorney you have

25    something to tell the prosecutors?

1          THE WITNESS:  Hmm.  He was still on the tier in our

2     unit at that time.

3          THE COURT:  When you say you were going back to the

4     feds, why were you here in D.C.?

5          THE WITNESS:  On my appeal.

6          THE COURT:  I see.  They kept you here even though --

7          THE WITNESS:  Once I lost the 23-110, they still kept

8     me here for the appeals court.

9          THE COURT:  So before that, you were serving a

10    sentence somewhere; right?

11         THE WITNESS:  Yes.  I was in Kentucky.

12         THE COURT:  You filed a 23-110.  There was an appeal.

13    You weren't sent back.  But after the appeal, you knew you were

14    going back.

15         THE WITNESS:  Yeah.

16         THE COURT:  And it was at that time that you

17    approached your lawyer and said what to your lawyer?

18         THE WITNESS:  Terry Eaton.

19         THE COURT:  Yeah, what did you say to him?

20         THE WITNESS:  I told him that a guy was threatening

21    about killing white people, policemen, and the person that set

22    him up, he was going to kill them when he get out, because he

23    said he was going to beat the charge.  I don't know nothing else

24    about it.

25         THE COURT:  Your appeal had been decided by that time,

1   though; right?

2           THE WITNESS:  Yes.

3           THE COURT:  So let me ask you this:  Why hadn't you

4   said anything before the appeal had been decided and before

5   the --

6           THE WITNESS:  You're talking about the 23-110 or

7   the --

8           THE COURT:  Yeah.

9           THE WITNESS:  But I still had the appeals court, too.

10  That was in --

11          THE COURT:  My question is, why hadn't you said

12  something earlier to your attorney about what you heard

13  Mr. Calloway saying?

14          THE WITNESS:  I did.  We was still waiting on a

15  decision on the appeals court.  He had already knew then.

16          THE COURT:  All right.  So he knew that you had heard

17  these comments?

18          THE WITNESS:  Yeah.

19          THE COURT:  All right.  It wasn't, then, after the

20  appeal had been decided?

21          THE WITNESS:  No, it was after the 23-110 but not

22  after the appeals, the appeals court.

23          THE COURT:  The appeal probably took a year or two

24  probably; right?

25          THE WITNESS:  No, I don't think it took that long, but

1    we was looking to win that one because everything was in my

2    favor, you know, on the appeals court, and they just asked for

3    oral argument, and I thought we was going -- I was leaving then.

4    But he had already knew, and we talked to the government way

5    before then, though.

6            THE COURT:  Your attorney had spoken to the government

7    before the appeal was decided?

8            THE WITNESS:  Yeah.  If I would have went home off my

9    appeal, I would have still came back and testified.  It didn't

10   make a difference.  In my heart, I just didn't want to see this

11   on the news and I knew about this.  That's all I was concerned

12   about.

13           THE COURT:  Those are my questions, because I think

14   it's important when the comments were made to the attorney and

15   when the attorney reached out to the government.

16           MR. PEARLMAN:  Your Honor, we don't have any other

17   questions.

18           THE COURT:  All right.

19           MR. PEARLMAN:  I did want to just supplement --

20           THE COURT:  Do you want to ask any questions along

21   those lines that I was just inquiring?

22           MR. VANEGAS:  No, Your Honor.

23           THE COURT:  All right.  Yes, Counsel.

24           MR. PEARLMAN:  So I can hand up to the Court testimony

25   from Mr. McCants dated May 19th, 2017, pages 69 through 73,

1     which I think would show that there's possibly some confusion

2     when the two of them were talking.

3              THE COURT:  All right.  Do you have a copy of the plea

4     agreement also, Counsel?  I think that should be made a part of

5     the record.  I don't know what her colloquy was, but according

6     to -- whether Mr. Paris was asked whether he read the plea

7     agreement during the colloquy.

8              MR. PEARLMAN:  I will get a copy of the plea

9     agreement, yes.

10             THE COURT:  Or a transcript of the colloquy.  I don't

11    know.  Have you seen the colloquy between Judge Anderson and --

12             MR. PEARLMAN:  I assume it's been ordered, given

13    everything that happened afterwards.

14             THE COURT:  Can you tell me whether or not she asked,

15    Did you read the plea agreement before you signed it?

16             MR. EATON:  I believe she did, Your Honor.  It's been

17    quite some time since I've read that transcript, but I believe

18    she did.

19             THE COURT:  All right.  So let's assume that she asked

20    you that question, Did you read this plea agreement.

21             THE WITNESS:  Yes, she did ask me.

22             THE COURT:  And you said yes?

23             THE WITNESS:  No.

24             THE COURT:  You told her no?

25             THE WITNESS:  I told her no.  I told her Kevin McCants

1    read it to me.  It's in the transcript that I said that.

2              THE COURT:  So it might be helpful to get a copy of

3    it.

4              THE WITNESS:  I know for a fact I testified that Kevin

5    McCants read that to me and he read 11(c)(1)(C).

6              THE COURT:  And he said he was confused, and

7    nevertheless, the -- well --

8              MR. PEARLMAN:  I think if you read pages 69 through

9    73, it's a little bit of an "it is what it is" scenario.  It

10   could have been clearer.

11             THE COURT:  All right.  Thank you.  Anything further?

12             MR. PEARLMAN:  Not from the government.

13             THE COURT:  Are there any other pleadings -- the plea

14   agreement would be helpful, I think.  That plea colloquy, I

15   would like to see that.

16             MR. PEARLMAN:  Your Honor, I will get the plea

17   agreement, and I will get -- and I'm kind of looking at

18   Mr. Eaton here -- the transcript for the plea.  We can get those

19   two documents for you.

20             THE COURT:  Is there something else pending there on

21   behalf of your client?

22             MR. EATON:  No, Your Honor.  We did not file an appeal

23   to the U.S. Supreme Court.  So the appeal at the D.C. Court of

24   Appeals would be the last --

25             THE COURT:  And the 23-110 never came to this court in

1    the first instance?  Sometimes they do.

2              MR. EATON:  It did not.

3              THE COURT:  It started before Judge Anderson, all

4    right.

5         Were you given an estimate by the court reporter about the

6    amount of time involved in getting the transcript?

7              MR. EATON:  With respect to the --

8              THE COURT:  When you'll get it of the plea colloquy.

9              MR. EATON:  I may have it.  I just need to look at my

10   files.  I may have it.

11             THE COURT:  All right.  Anything further, Counsel?

12             MR. PEARLMAN:  Not from the government.

13             THE COURT:  I think I will keep the record open for a

14   while so we can get the additional documents.

15        There are a couple of things the Court could do today --

16   I'm going to excuse the witness.  Do you have anything else you

17   want to say?

18             THE WITNESS:  No.

19             THE COURT:  Any other questions, Mr. Vanegas?

20             MR. VANEGAS:  No, Your Honor.

21             THE COURT:  I want to take about a five-minute recess

22   to talk with my staff.  It's up to the marshals --

23             MARSHAL:  Is he done for the day, Your Honor?

24             THE COURT:  Well, I may have an additional question or

25   two.  I just want to talk with my staff about five minutes.

It's your call as to whether you want to take him in the back.

I will take a five-minute recess, and then we will talk about whether the Court should pick a sentencing date now or -- certainly another status hearing.  I need to resolve the issue of the enhancement.  I think I would rather do that before the sentencing hearing.  So those are just kind of the parameters of what we need to talk about for the next five or 10 minutes or so.

I have to ask, the parties aren't able to work this out themselves?  Have you had any discussion about trying to resolve this issue?  It's a very interesting issue, but the stakes are really high.  But no interest, huh?  Okay.

(Recess taken from 1:01 p.m. to 1:06 p.m.)

THE COURT:  Marshal, I don't need the witness.  So if you need to take him back, that's fine.  Thank you.

So I'm going to put everyone to work.  I'm going to issue an order.

Marshal, I'm fine.  I don't need to bring the witness back.  Thank you.

I will post an order soon.  I think proposed findings of fact would be very helpful to the Court.  The time lapse, I was asking questions and trying to figure out motivation and time lines.  It sounds as if the witness actually said something to his attorney either during the pendency of the appeal but certainly after the 23-110 hearing, but that needs to be

explored.  And I think that there's enough testimony in the
record for there to be a proposed finding along those lines,
because it gets into a question of motivation, too.  It's one
thing to say something after all of your appeals have expired as
opposed to saying something during the time when you have an
appeal pending.

I think there's some additional documents that need to be
produced, and I'm going to spell all that out in an order.
Certainly, the plea agreement, the colloquy, because I'm
unclear -- I'm certainly not sitting and reviewing with Judge
Anderson what the D.C. Court of Appeals did.  It is somewhat
curious that, in view of what McCants said, the plea wasn't just
set aside.  But that's fine.  That was reviewed by the Court of
Appeals.  The Court of Appeals didn't find any error.  I assume
they looked at the transcript of the proceedings before the
judge.  It would be helpful to get that MOJ.

MR. CHAWLA:  Your Honor, I do have a copy of the MOJ
dated July 24, 2019, so just last year.  And Mr. Paris was
interviewed by law enforcement in June 2018, more than a year
before that.  So the appeal was not even heard.  It was
submitted on June 27, 2019, and issued an opinion on July 24,
2019, so consistent with his testimony.

THE COURT:  Did the Court of Appeals address that
issue of what McCants said?

MR. CHAWLA:  It does.  It recognizes that, in fact,

1    there was this back and forth.

2           THE COURT:  Really?

3           MR. CHAWLA:  It's -- McCants referred to it as a (C)

4    plea, and then he subsequently explained, however, too many

5    years, too many cases, he might have been confused with another,

6    and it wasn't a (C) plea, but acknowledges that he did, in fact,

7    say it in testimony but then retracted it.

8           THE COURT:  And did the Court of Appeals nonetheless

9    affirm the plea colloquy?

10          MR. CHAWLA:  It's a credit to the judge about

11   determinations of fact, and the Court of Appeals didn't second

12   guess the --

13          THE COURT:  Right.

14          MR. CHAWLA:  It's a finding of fact.  And if the trial

15   court says, I didn't credit this person, I credit this person,

16   that's really hard to get behind.

17          THE COURT:  No, you're right.

18      Why don't you have that marked as an exhibit.  But there

19   needs to be a paper trail.  I'm sure whatever I do, there will

20   be other proceedings.

21      Counsel passed up the transcript of the proceeding dated

22   April the 13th, or a portion of it that starts at page 16.  I

23   might hand it back.  I think all these documents ought to be

24   marked so there is a clear paper trail, so that whatever I do

25   can get affirmed.  All right?  If you want to introduce it now,

1    Counsel, and have it marked, that's fine.  I'm going to hand

2    that back just so you can mark it and I can formally make that a

3    part of the evidentiary record.  The MOJ, if you want to mark

4    that today or not.  I'm going to ask for some more documents.

5         Another way to approach it would be to have another status

6    hearing where the government formally moves these documents into

7    evidence, because there will be some other documents that the

8    Court will need.  Since we have those two today, I guess the

9    Court can receive those documents today.

10        I am unclear whether I need the transcript of the plea

11   colloquy.  I have the MOJ.  It's a fait accompli.  I don't know.

12   Any thoughts?  Would it help the Court to have the plea

13   colloquy?

14             MR. PEARLMAN:  We would defer --

15             THE COURT:  Have you seen it?

16             MR. PEARLMAN:  I have reviewed it at some point, but I

17   don't have it today.

18             THE COURT:  You know what?  Let me err on the side of

19   caution.  Let me receive it at the appropriate time.  I can read

20   it and credit whatever I want to credit or reject it or

21   whatever.  I think it would be helpful, because I've got to

22   determine, obviously, what the motivations are, if any, of this

23   witness, his credibility.  He's got a significant criminal

24   record involving convictions for what appear to be crimes of

25   moral turpitude.  So there's a lot going on here.

1      What makes sense in terms of proposed -- how much time do

2  you need for proposed findings?  30 days, does that make sense?

3           MR. PEARLMAN:  30 days would be fine for the

4  government.

5           THE COURT:  And the introduction of additional

6  documents.  All right.  And I will spell all this out in the

7  order.  The government should file first.  And do you need 30

8  days after that, Counsel?

9           MR. VANEGAS:  That's fine, Your Honor.

10           THE COURT:  All right.

11           MR. CHAWLA:  Your Honor, the only thing that would be

12  a limitation is the transcript.  We have a copy of his

13  testimony, but we need a copy of the transcript.

14           THE COURT:  Okay.  I will spell all this out.  Maybe

15  another -- actually, I'm not sure I need another status.  So

16  maybe a hearing to determine the enhancement issue only and a

17  separate sentencing date.

18      Any objection to that approach?  I welcome any other

19  suggestions you may have.

20           MR. PEARLMAN:  I think the Court could do both at the

21  same time.

22           THE COURT:  I could.  I could do that.  I could do

23  that.  And in fact, I don't have any problems doing that.  So

24  probably a date in May.  And I didn't bring my calendar in.

25  Just tell me whether you have bad days the first week of May or

1   the first two weeks of May, and I will work around it and give

2   you a date that -- if you want to suggest a date, if I can

3   accommodate you, I will.

4       I have a trial in May, don't I, Mark?

5       (The Court conferred with the courtroom deputy.)

6           THE COURT:  How about May the 5th at 10:30?  Bad date

7   or bad time?

8           MR. PEARLMAN:  It's fine for the government.

9           MR. VANEGAS:  That's fine, Your Honor.

10          THE COURT:  All right.  I will issue a written order

11  today, at the latest tomorrow.  Any questions?  Anything

12  further?  Any other witnesses?

13          MR. PEARLMAN:  No, Your Honor.  In fact, we had had

14  that earlier litigation concerning whether there are any issues

15  of disputed fact.  I think this was the only issue.

16          THE COURT:  Right.  All right.

17      And the proposed findings of fact -- because I'm fairly

18  comfortable, whatever I do, there's going to be an appeal.

19      You don't get many of these hearings, do you, these

20  enhancement hearings in this court, do you?

21          MR. PEARLMAN:  We have moved for departures upwards

22  before, and we deal with downward departures, of course, from

23  the defense all the time.

24          THE COURT:  Right.  Any recent published opinions by

25  any of my colleagues on this issue?

1          MR. PEARLMAN:  Not on the specific issue concerning

2     924(b) or, that I'm aware of, specific enhancements for the

3     reasons that we asked for enhancements.

4          THE COURT:  All right.  So I'm not ruling now.  The

5     Court may issue a written opinion at some point, but it would be

6     after sentencing.  I will at least be able to state my reasons

7     on the record for purposes of any appeal by anyone, and it

8     probably can be followed up by written opinion, but maybe not.

9     I will play it by ear.

10          All right.  This has been very helpful.  Thank you all.

11     Mr. Calloway, take care.  Thank you, Counsel.  Mr. Eaton, good

12     to see you again.

13          (Proceedings adjourned at 1:16 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE OF OFFICIAL COURT REPORTER

I, Sara A. Wick, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/ Sara A. Wick                         February 19, 2020
SIGNATURE OF COURT REPORTER              DATE